**Ann ADLER, Plaintiff,**

v.

**Daniel C. LYNCH et al., jointly and severally, Defendants.**

**Civ. No. 72–0–270.**

United States District Court,
D. Nebraska.

June 3, 1976.

Emmett D. Childers, Miller & Russell, P. C., Omaha, Neb., for plaintiff.

Donald L. Knowles, County Atty., and William T. Ginsburg, Deputy County Atty., Omaha, Neb., for defendants.

## MEMORANDUM

RICHARD E. ROBINSON, Senior District Judge.

This matter is before the Court under 28 U.S.C.A. § 1331 (1966) and 28 U.S.C.A. § 1343(3) (1962) after trial to the Court without a jury. At the time the events in this case transpired the plaintiff was the owner of certain land situated in Douglas County, Nebraska, and she has filed suit under 42 U.S.C.A. § 1983 (1974) against the individual members of the Douglas County Board of Commissioners alleging that she has been deprived by them of her constitutional rights under color of state law.

## I.

The facts of the case are uncontroverted for the most part and show that prior to August 11, 1972, the plaintiff purchased a parcel of land within the Two Rivers Farmstead Project, in Douglas County, Nebraska, for the purpose of establishing a family residence and dog kennel. At the time the plaintiff acquired the property it was zoned SF–1 for single family residences under the County's zoning plan. The establishment of the kennel on the land in question was, therefore, in violation of law. The plaintiff testified that she first learned of the zoning restriction after she acquired her property but before she took possession of it.

The plaintiff received a letter from the County's Permits and Inspection Department on August 11, 1972, advising her that the kennel was in violation of law and ordering her to remove the violation within thirty (30) days. (Filing No. 12, Exhibit 1). The plaintiff, therefore, commenced proceedings to have the zoning plan amended as to the Two Rivers Farmstead Project. (Exhibit 18). Her petition was initially brought before the County's Planning Commission for a public hearing, and the Commission voted to recommend to the Board of Commissioners that the proposed amendment be denied. The matter was subsequently brought before the members of the Board of Commissioners on July 31st, 1973, and they voted to deny the petition for rezoning, (Exhibit 5), but to grant the plaintiff "one year to resolve her problem regarding the dog kennel . . . ." (Exhibit 6).

After the July 31st meeting, some concern arose over whether or not the Commissioners had authority to permit a violation of the zoning plan "without specific request." Therefore, the Chairman of the Board of Commissioners requested a legal opinion from the deputy county attorney. (Exhibit 16). The Chairman's letter to the deputy county attorney said "If our action in this matter was illegal, Mrs. Adler should be advised immediately." [1]

On September 6th the deputy county attorney advised the Chairman that the Commissioners had authority to grant a "variance" from the zoning plan in cases of "exceptional hardship", but that they had no authority to grant variances for reasons of "convenience, profit or caprice." (Exhibit 15). The deputy county attorney then stated that in his opinion the plaintiff might be under exceptional hardship for a ninety (90) day period, but that any longer period of time could be interpreted as a

---

1. The full text of the August 28th letter provides:

> "The County Board recently took action regarding a rezoning request for a dog kennel that affected a Mrs. Ann Adler and her neighbors.
>
> The decision of the County Board was to adopt the recommendation of the Planning and Zoning Commission and deny the request. But the County Board also allowed Mrs. Adler one year to relocate and phase out her operation at this site.

> There apparently has been some concern regarding this decision. I would like your advice, in writing, as soon as possible regarding the ability of a County Board to allow, without specific request, a violation of a zoning ordinance.
>
> If our action in this matter was illegal, Mrs. Adler should be advised immediately.
>
> Thank you very much."
>
> (Exhibit 16).

variance granted for reasons of convenience or profit and "beyond the scope of the Board's power." His letter concluded by stating that:

"(s)ince the notice Mrs. Adler received on July 31, 1973, was for one year, it is my opinion that the ninety day period should not begin until this date. Pursuant to your request of August 28, 1973, I will notify Mrs. Adler of this opinion."

(Exhibit 15).

A copy of Exhibit 15 was mailed to the plaintiff along with a cover letter from the deputy county attorney which provided:

"I am enclosing a copy of my response to Chairman Lynch concerning the legality of the Board's action in granting you one year to resolve your problem.

"Inasmuch as December 6, 1973, will be approximately four months and one week from the Board's July 31st decision, I believe that you will have sufficient time to relocate or phase out your operation.

"If you have any questions on this matter please feel free to contact me."

(Exhibit 14).

On September 14, 1973, the plaintiff listed her property for sale. (Exhibit 19). No further action was taken until December 6, 1973. On that date the plaintiff's property was inspected at the request of the deputy county attorney who was allegedly responding to citizen complaints regarding the plaintiff's kennel. When it was learned that the kennel had not been removed within the time specified in the September 6th letter (Exhibit 14) the deputy county attorney decided to file a criminal complaint against the plaintiff. Though he testified at trial that in his personal view a successful prosecution could have been brought notwithstanding the July resolution, his superiors persuaded him to postpone any prosecution until the July resolution was amended or repealed.

Therefore, the deputy county attorney placed himself on the agenda for the December 18th meeting of the Board of Commissioners. General notice of the meeting was duly published on December 13th, (Exhibit 1A), however, no individual notice was given to the plaintiff.[2]

At the December 18th meeting the deputy county attorney outlined the existing situation to the Board (Exhibit 1) and offered an amendment to the Board's July resolution which brought it into conformity with his letter of September 6th. (Exhibit 7). The proffered resolution was unanimously passed, providing in part:

"THEREFORE, BE IT RESOLVED BY THIS BOARD OF COUNTY COMMISSIONERS THAT the Board of Adjustment of Douglas County hereby declares its July 31st resolution amended to conform with the legal requirements outlined in the County Attorney's opinion of September 6, 1973, namely, that a variance for Mrs. Adler could extend only until December 6, 1973.

". . . THAT in view of the fact that on December 7, 1973, Mrs. Adler was boarding thirteen dogs in violation of County Zoning Regulations that a nuisance is hereby declared to exist.

". . . THAT in view of the fact that Mrs. Adler was notified on September 6, 1973, that she should relocate or phase out her operation by December 6, 1973, that the County Attorney be instructed to bring any and all legal actions necessary against the willful violations of the above-mentioned regulations."[3]

(Exhibit 7). On January 17, 1974, a criminal complaint was filed against the plaintiff

---

**2.** The published notice generally advised the citizens of Douglas County that matters appearing on the agenda of the Board of Commissioners would be taken up at a specified time and place, and that copies of the agenda were available at the County Clerk's office. (Exhibit 1A). The agenda, itself, provided as follows:

"11. Deputy County Attorney — Board of Adjustment.
Roger Holthaus — Dog Kennel—Zoning Violation."

**3.** Though the plaintiff did not receive individual prior notice of the December 18th proceedings it was established at trial that she received

charging her, in count one, with a violation of the County's zoning ordinance, and in count two, with disturbing the peace. (Exhibit 9). According to the complaint, both offenses allegedly occurred on or about December 7, 1973—eleven days prior to the December proceedings amending the July resolution.

On January 22nd, the plaintiff was arrested and incarcerated for a period of about four (4) hours, before bond was posted. Her attorneys subsequently filed a motion to dismiss the criminal complaint, which was sustained as to Count one, the state court observing that:

"The Board did nothing to void or amend its action of July 31, 1973, until December 18, 1973, some eleven days after, it is now alleged she committed the offenses alleged in the complaint. Such action done, particularly without notice to the defendant, smacks of *ex post facto* legislation. . . ."

(Exhibit 9).

Count two was later dismissed on the motion of the deputy county attorney when it was learned that his witnesses had not appeared for trial.

The plaintiff sold her property on or about March 29, 1974, and the kennel was removed. (Exhibit 22).

## II.

On the basis of the foregoing evidence, the plaintiff contends that she has suffered compensable injury as a result of a violation of her constitutional rights under color of state law. 42 U.S.C.A. § 1983 (1974). She contends that under the circumstances shown above she was denied effective participation in the December proceedings because she did not receive individual notice that such proceedings would be held. Furthermore, she contends that the defendants violated her constitutional rights by amending her variance in such a manner as to subject her to legal jeopardy for antecedent conduct which was in full compliance with the law when engaged in by her.

The defendants deny that the July resolution can properly be characterized as a variance. They contend that it was merely an informal, if official, accommodation extended by them to the plaintiff in order to keep her from being in immediate violation of the zoning plan upon their rejection of her proffered amendment to the plan. Consequently, they contend that under the circumstances, the plaintiff was properly notified of the amendment to the July resolution by the deputy county attorney's letter of September 6th and that she was not subject to legal jeopardy for antecedent conduct.

## A.

Under Nebraska law, when strict compliance with the zoning plan would result in "peculiar and exceptional practical difficulties to, or exceptional and undue hardship upon" a property owner, the county is authorized to permit a variance from the strict application of the plan under prescribed circumstances.[4] Requests for vari-

---

word of the result of those proceedings from her attorneys almost immediately.

4. Neb.R.S. § 23–168.03(3) (Reissue 1974), provides:

"Where by reason of exceptional narrowness, shallowness, or shape of a specific piece of property at the time of the enactment of the regulation, or by reason of exceptional topographical conditions or other extraordinary and exceptional situation or condition of such piece of property, the strict application of any enacted regulation under this act would result in peculiar and exceptional practical difficulties to, or exceptional and undue hardship upon the owner of such property, (The Board of Adjustment is em-

powered) to authorize, upon an appeal relating to the property, a variance from such strict application (with the plan) so as to relieve such difficulties or hardship, if such relief may be granted without substantial detriment to the public good and without substantially impairing the intent and purpose of any resolution, but no such variance shall be authorized unless the board of adjustment finds that: (a) The strict application of the resolution would produce undue hardship; (b) such hardship is not shared generally by other properties in the same zoning district and the same vicinity; (c) the authorization of such variance will not be of substantial detriment to adjacent property and

ances are heard before a special and distinct body, called the County Board of Adjustment. Neb.R.S. § 23–168 (Reissue 1974). The proceedings of the Board of Adjustment are quasi-judicial in nature, in the sense that "parties in interest" are entitled to "due notice" of, and an opportunity to participate in the proceedings. Neb.R.S. § 23–168.02 (Reissue 1974). A Board of Adjustment is empaneled by resolution of the Board of Commissioners and may be composed of either the Commissioners themselves, Neb.R.S. § 23–168 (Reissue 1974), or others, appointed for a fixed term. Neb.R.S. § 23–168.01 (Reissue 1974). The parties do not seem to dispute, that in Douglas County the Commissioners themselves compose the Board of Adjustment.

When a citizen wishes to amend the zoning plan, itself, a petition to amend the plan is brought before the County Board of Commissioners. Neb.R.S. § 23–165 (Reissue 1974). A public hearing is required by law where "parties in interest and citizens" are entitled to an opportunity to be heard. Neb.R.S. § 23–164 (Reissue 1974). The only notice required for such proceedings, however, is general notice published at least ten (10) days prior to the hearing.

█ Though there are, perhaps, certain difficulties involved in characterizing the

July resolution as a variance,[5] it is clear from the evidence that it was an official act of the County Board and under Nebraska law the Board's only power to grant an exemption from the zoning plan is its authority to grant variances under the circumstances prescribed in Neb.R.S. § 23–168.03(3).[6] It is, therefore, clear that while the July proceedings may have been defective,[7] the resolution was in nature and substance a variance and must be treated as such in resolving the issues in this case.

### B.

█ A variance is, of course, legal authority for a specific property owner to use his property in a manner otherwise forbidden by the zoning plan. *Roncka v. Fogarty,* 152 Neb. 467, 41 N.W.2d 745 (1950); Neb. R.S. § 23–168.03 (Reissue 1974); 101 C.J.S. Zoning § 273, p. 1038. When a variance from the zoning plan is granted it is presumed to be legal and correct until rescinded, amended, or reversed by a court of competent jurisdiction. *See* Neb.R.S. § 23–168.04; 101 C.J.S. Zoning § 362, p. 1202. The defendants in the present case had inherent power to reconsider the July variance, 101 C.J.S. Zoning § 218, p. 978, and, no doubt, could have amended the July variance to require the immediate removal of the plaintiff's kennel, in proper

the character of the district will not be changed by the granting of the variance; and (d) the granting of such variance is based upon reasons demonstrable and exceptional hardship as distinguished from variations for purpose of convenience, profit or caprice."

5. Among those difficulties are: (1) the July variance was issued in the course of proceedings before the Board of Commissioners rather than the Board of Adjustment which is the only body empowered to grant variances from the zoning plan; (2) the July hearing was not preceded by proper notice to the parties in interest, Neb.R.S. § 23–168.02 (Reissue 1974); (3) there is a question as to whether or not the substantive requirements of Neb.R.S. § 23–168.03(3), *supra* at note 3, were considered by the Board, or are applicable to the plaintiff's problem.

6. *Supra,* note 3. The defendants have implicitly argued that the County Board has inherent authority to grant a property owner a tempo-

rary exemption from the strict application of the zoning plan, without compliance with §§ 23–168.02; 23–168.03(3) in circumstances where a property owner has sought to amend the zoning plan and would be in immediate violation of the plan upon the County's rejection of the proffered amendment. However, even if such authority existed it is clear that neither the deputy county attorney nor the individual members of the Board of Commissioners would have the authority to amend or rescind a resolution duly passed by the Board pursuant to such inherent authority, and it is also clear that the nature of such an exemption would be so similar to that of a variance that the procedures constitutionally required to amend or rescind such an exemption would be substantially the same as the procedures required to amend or rescind a variance granted pursuant to § 23–168.03(3) in proper proceedings.

7. *Supra,* note 4.

proceedings.[8]  However, the proceedings to amend the July variance were not conducted properly.  Just as an applicant for a variance is entitled to individual notice and a hearing on his application, Neb.R.S. § 23–168.02 (Reissue 1974), one who enjoys the benefit of a variance is entitled to notice and hearing before any action is taken to alter, amend or rescind such variance.  At 101 C.J.S. Zoning § 314, p. 1098, the editor states: "(i)f the board has power to rescind its prior decision, it cannot legally do so without giving the applicant for the variance notice of the proceedings to reconsider."  Notice is required for two reasons.  First, it alerts the applicant to the fact that his exemption may be lost so that he might avoid an unintentional violation of the zoning ordinance.  Second, it advises the applicant of the time and place of the hearing so that he might attend and effectively participate in the proceedings.

▮  The notice received by plaintiff in the present case was ineffective on both counts.  Though the letter of September 6th alerted the plaintiff to certain difficulties with her variance, it did not advise her that any Board action was contemplated at any particular time and place.  Indeed, it seems to proceed upon the presumption that no Board action was necessary.  Likewise, the general published notice of December 13th does not give notice of the fact that plaintiff's variance would be the subject of further Board action, even when read in conjunction with the Board's agenda which was not published.[9]  Consequently, it seems clear to the Court that the plaintiff has been subjected to a deprivation of due process of law, by being denied proper notice of, and an opportunity to effectively participate in, the proceedings of December 18th.

### C.

▮  The contention that the December resolution was *ex post facto* legislation, or was otherwise substantively violative of the due process clause is, however, clearly incorrect.  The effect of that resolution was simply to require the immediate removal of the kennel from the plaintiff's property through legal means.[10]  It is wholly unreasonable to interpret the December resolution as an order directing the county attorney to file criminal charges, or as creating a criminal liability for antecedent conduct.  The Board of Commissioners has no authority over the exercise of the county attorney's prosecutorial discretion and the resolution does not in express terms make the plaintiff's December 7th conduct criminal retroactively, and should not be so interpreted merely because the deputy county attorney gave it such an interpretation.  All that the resolution does on its face is to declare a nuisance to exist on the basis of evidence which putatively existed eleven (11) days prior to the hearing and direct the county attorney to abate the nuisance.  That can be accomplished under state law without resort to a criminal prosecution.

The most that can be said for plaintiff's position in this regard is that the December resolution is subject to misinterpretation, and was misinterpreted in this case.  Standing alone, that is insufficient to establish that the plaintiff has been deprived of her constitutional rights by these defendants.

### III.

▮  The defendants contend that even though the plaintiff's constitutional right to notice of the December proceedings has been violated, they are not personally liable for damages under § 1983 because they are

---

**8.**  In this regard it is to be noted that nothing the Board did caused the kennel to be established on the plaintiff's property contrary to law and it appears clearly from the evidence that the July resolution was passed solely to accommodate the plaintiff.  Therefore, the Board would not have been estopped either on July 31st, or at any subsequent time, from requiring the plaintiff to immediately comply with the law.

**9.**  *Supra,* note 2.

**10.**  *See* discussion, *supra,* note 8.

public officials who were acting within the scope of their authority when the events in this case transpired and they are therefore immune from liability.[11] *See Wood v. Strickland,* 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1974); *Pierson v. Ray,* 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967); *Tenney v. Brandhove,* 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019 (1951). Despite the categorical language of § 1983, imposing personal liability on "(e)very person" who deprives a citizen of his constitutional rights under color of state law, it is now settled that government officials, who must conceive and administer public policy, are not personally liable for every official act "which is found subsequently to have been violative of a . . . (person's) constitutional rights and to have caused compensable injury . . . ." *Wood v. Strickland, supra,* 420 U.S., at 319, 95 S.Ct. at 999. The necessity for official immunity under § 1983 has been amply explained elsewhere and will not be belabored here. Essentially it is based upon the conclusion that:

"[T]he public interest requires decisions and action to enforce laws for the protection of the public. Mr. Justice Jackson expressed this general proposition succinctly, stating 'it is not a tort for government to govern.' *Dalehite v. United States,* 346 U.S. 15, 57, [73 S.Ct. 956, 97 L.Ed. 1427] (1953). (dissenting opinion). Public officials, whether governors, mayors, or police, legislators or judges, who fail to make decisions when they are needed or who do not act to implement decisions when they are made do not fully and faithfully perform the duties of their offices. Implicit in the idea that officials have some immunity—absolute or qualified—for their acts, is a recognition that they may err. The concept of immunity assumes this and goes on to assume that it is better to risk some error and possible injury for such error than not to decide or act at all." (Footnote omitted).

*Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90, *supra,* 416 U.S., at 241–242, 94 S.Ct. at 1689.

■ The defendants in the present case are elected members of a local governing body. While their duties include the enactment of local ordinances, *see generally Tenney v. Brandhove, supra,* they derive their powers from the state legislature, and exercise a limited jurisdiction over matters specifically committed to their discretion. Neb.R.S. §§ 23–104 *et seq.* (Reissue 1974). In the Court's judgment the nature of their duties is such as to be distinguishable from the type of judgment and discretion exercised by judges and legislators who enjoy absolute immunity under § 1983 because they must conceive public policy from the myriad policy options open to the sovereign, *Pierson v. Ray, supra; Tenney v. Brandhove, supra,* and similar in significant respects to the type of discretion exercised by executive officials who have a more limited jurisdiction, and, must confine their discretion to matters which are more or less specifically defined within the state's public policy. *Scheuer v. Rhodes, supra; Sterling v. Constantin,* 287 U.S. 378, 53 S.Ct. 190, 77 L.Ed. 375 (1932). In the recent case of *Wood v. Strickland, supra,* the Supreme Court found that local school board officials exercising quasi-judicial authority in student disciplinary proceedings enjoy only a qualified immunity from liability under § 1983. Though the duties of the defendants in the present case are somewhat broader than those of school board officials, they are similar in nature, and subject to most, if not all, of the same considerations which influenced the *Wood* court. Consequently, the defendants in this case are

11. The defendants have also argued that they are not liable because the lack of notice and hearing prior to the December 18th proceedings did not proximately cause the plaintiff's injuries. The defendants point out that the only damages claimed by the plaintiff are those resulting from her arrest and they seem to argue that the prosecutor's total discretion over whether or not to file criminal charges constitute an intervening and superceding cause for the plaintiff's injuries.

The Court has rejected this contention because it seems clear that the injuries sustained by the plaintiff are directly related to the Board's December 18th action, and are of a type which are reasonably foreseeable in light of that action.

immune only if they have conducted themselves reasonably and in good faith under the circumstances of the case.

■ The plaintiff contends that the defendants have failed to establish their good faith in this case because their actions on December 18th deprived her of "clearly established", "basic, unquestioned constitutional rights". *Id.* 420 U.S., at 322, 95 S.Ct. 992. In the *Wood* case the Supreme Court held that in an action involving the question of qualified immunity under § 1983, the lack of good faith of the defendants could be established in at least two ways. The court said:

> "To be entitled to a special exemption from the categorical remedial language of § 1983 in a case in which his action violated a student's constitutional rights, a school board member, who has voluntarily undertaken the task of supervising the operation of the school and the activities of the students, must be held to a standard of conduct based not only on permissible intentions, but also on knowledge of the basic, unquestioned constitutional rights of his charges. . . .
> Therefore, in the specific context of school discipline, we hold that a school board member is not immune from liability for damages under § 1983 if he knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the student affected, or if he took the action with the malicious intention to cause a deprivation of constitutional rights or other injury to the student. That is not to say that school board members are 'charged with predicting the future course of constitutional law.' *Pierson v. Ray,* 386 U.S., at 557 [87 S.Ct. 1213]. A compensatory award will be appropriate only if the school board member has acted with such an impermissible motivation or with such disregard of the student's clearly established constitutional rights that his action can-

not reasonably be characterized as being in good faith."

*Id.,* 420 U.S., at 322, 95 S.Ct. at 1000.

There has been no suggestion in the present case that the defendants were motivated by subjective bad faith in their amendment of the July resolution. The plaintiff does contend, however, that the defendants knew, or reasonably should have known that the plaintiff was constitutionally entitled to prior notice of the December proceedings.

Ordinarily, one might expect those who administer a zoning plan to know the procedural rights of those effected by their orders and decisions. However, under the circumstances of this case, it would seem that after the July resolution was passed the defendants were confronted with a rather complex situation which significantly blurred the procedural rights of the plaintiff.

As noted above, when the plaintiff initially encountered her zoning problem, she sought to have the zoning plan amended by the Board of Commissioners. The July resolution, which has heretofore been characterized as a variance was therefore not granted in the course of proceedings instituted before the Board of Adjustment—the only body authorized by law to grant variances from the zoning plan. This defect standing alone raises serious questions regarding the effect of the Board's July action. Implicit in the Board Chairman's letter of August 28th is a genuine concern that the July resolution might not be merely voidable, but void and that the plaintiff might be subject to unfavorable legal consequences despite such resolution. Those fears were not without substance. Several courts have held that a variance, or other exemption from the strict application of a zoning plan, is a "nullity" when it is not issued by the board, or body authorized by law to grant such exemptions. *Depue v. City of Clinton,* 160 N.W.2d 860 (Iowa 1968); *Lowry v. City of Mankato,* 231 Minn.

108, 42 N.W.2d 553 (1950). Though the defendants in the present case are members of the Board of Adjustment, it seems to the Court entirely reasonable that they might question the validity of the July resolution, since, to all outward appearances, it was enacted by the defendants, not as members of the Board of Adjustment, but as members of the Board of Commissioners.

The defendants, therefore, turned the matter over to their legal advisor. He advised them that a "Board of Adjustment" had certain authority to grant a "variance"; that he felt that authority was exceeded in this case; and, that he would notify Mrs. Adler that she had ninety (90) days to remove the kennel from her property. (Exhibit 15). The record reflects that they received no advice from any quarter suggesting that they were being improperly advised by their attorney. Though they may be chargeable with knowledge of the proceedings required to amend a variance under ordinary circumstances, the Court does not feel that they can rightfully be charged with knowledge that those procedures were required in this case, since the last paragraph of the deputy county attorney's letter of September 6th clearly implies that such procedures are not required, as did his appearance before the Board on December 18th.

The Court does not interpret *Wood* to stand for the proposition that it is not good faith for an official to accept erroneous advice from his appointed counsel on a question of law of sufficient complexity to justify a resort to expert legal guidance, at least, when the advice which is forthcoming is not patently unreasonable under the circumstances of the case.[12] To hold otherwise, and predicate personal liability upon the defendants dependency upon expert legal counsel would seriously and substantial-

ly undermine the very purposes for which the doctrine of official immunity was developed. The principal effect of such a holding would be to make public officials—who are often not themselves attorneys—skeptical of apparently reasonable advice from qualified counsel, uncertain of their personal wellbeing in the exercise of their official discretion whenever the matter at hand was beyond their personal level of legal sophistication, and ultimately timid in their administration of the law, especially in the enforcement of the ill-defined outer limits of most public policies. A restraining influence of this nature would prevent far more than unreasonable and bad faith conduct. It would significantly threaten the official's ability to act reasonably upon the advice and information he receives from customary and dependable sources and would require him to devote an undue amount of time and study to legal questions, only marginally related to his official duties, thereby distracting him from the important affairs of government, and frustrating the fulfillment of public policy.

Accordingly, it is held that the defendants in this case are immune from personal liability under § 1983 under the circumstances in this case. Judgment to that effect will be entered in favor of the defendants.

---

12. In the present case there is little doubt that the defendants reasonably accepted the deputy county attorney's advice. Not only were the procedures employed to amend the July variance substantially the same as those employed when the July variance was granted, *see* Neb. R.S. §§ 23–154; 23–165 (Reissue 1974), but the defendants were advised by the deputy county attorney that the plaintiff was on notice of inherent deficiencies in the July variance and had never responded to such notice even though she was guided through all of these proceedings by a qualified legal counsel.