716 F.2d 1409
 G.T. SCOTT, Appellant,
v.
GREENVILLE COUNTY: C. Daniel Riddle; I.H. Gibson; Mike
Fair; Melvin Pace; John L. Bauer; W. Bentley Hines;
Johnnie M. Smith; W. Shannon Linning; Larry H. McCalla;
Marshall L. Cason; J. Harlon Riggins; W.B. Bennett;
Charles F. Styles; Clyde E. Morgan, individually and as
members of Greenville County Council; Robert T. Ashmore;
E.A. Peddycord and W.S. Farmer, Jr., individually and as
members of Buxton Subdivision, Garden Terrace Community,
Crestwood Drive Community and the State Park Road Community,
Manly Drive, Deamlany Way and Hillandale Circle, Appellees.
 No. 82-2053.
 United States Court of Appeals,
Fourth Circuit.
 Argued April 14, 1983.
Decided Sept. 14, 1983.
 
 Keith M. Babcock, Columbia, S.C. (William F. Austin, A. Camden Lewis, Austin & Lewis, Columbia, S.C., on brief), for appellant.
 J.D. Todd, Jr., Greenville, S.C. (Leatherwood, Walker, Todd & Mann, William M. Grant, Jr., Ward Benjamin McClain, Jr., Haynsworth, Perry, Bryant, Marion & Johnstone, Joseph H. Earle, Jr., Greenville County Atty. and Charles Richard Stewart, Staff Atty., Greenville, S.C., on brief), for appellees.
 Before WINTER, Chief Judge, ERVIN, Circuit Judge, and BRYAN, Senior Circuit Judge.
 HARRISON L. WINTER, Chief Judge:
 
 
 1
 When plaintiff Scott, a real estate developer, sought a building permit to construct low-income apartments in an area of Greenville County, South Carolina, zoned for the density of the project that he wished to build, the County Council halted issuance of the permit pending consideration of a rezoning of the proposed building site. Plaintiff obtained a state trial court ruling declaring the Council's action illegal and ordering immediate issuance of the permit, but an appeal taken by intervening private landowners opposed to the project effectively tied up the permit for over sixteen months more. Scott subsequently brought this suit under 42 U.S.C. Sec. 1983 seeking damages for the alleged deprivations of various constitutional rights by the County, its Council, and the intervening landowners. He appeals from the district court's grant of summary judgment in favor of all defendants on numerous grounds. For the reasons that follow, we affirm in part, reverse in part, and remand this case to the district court for further proceedings.
 
 I. FACTS
 
 2
 The district court made no specific findings of fact, but since the court granted summary judgment for defendants, plaintiff "is therefore entitled ... to have the credibility of his evidence as forecast assumed, his version of all that is in dispute accepted, all internal conflicts in it resolved favorably to him, the most favorable of possible alternative inferences from it drawn in his behalf; and, finally, to be given the benefit of all favorable legal theories invoked by the evidence so considered." Charbonnages de France v. Smith, 597 F.2d 406, 414 (4 Cir.1979); see also Chastain v. Litton Systems, Inc., 694 F.2d 957, 959 n. 2 (4 Cir.1982), cert. denied, --- U.S. ----, 103 S.Ct. 2454, 77 L.Ed.2d 1334 (1983); Smith v. University of North Carolina, 632 F.2d 316, 338 (4 Cir.1980). We therefore state the facts in accordance with these principles:
 
 
 3
 G.T. Scott, a real estate developer since 1960, early in 1976 became interested in developing a particular parcel of land in Greenville County, South Carolina, into a multi-family low-income housing complex. During the subsequent two years Scott worked out the arrangements necessary towards building 156 units on the approximately thirteen-acre site, which throughout that time was zoned for multi-family dwellings. As of March 1978, Scott had acquired a purchase option for the land; had put together a partnership to pursue the project; and had obtained the earmarking of federal subsidy funds by the Department of Housing and Urban Development.[1] In addition, by the end of 1977, Scott had submitted detailed plans of the proposed apartment complex to the staff of the county planning commission. During January 1978, following what one top planning staff official described as a common "unofficial courtesy review" of a developer's plans prior to a formal permit application, the county planning commission staff found Scott's project to conform to the then-existing density, dimensional and parking requirements of Sec. 6:14 of the Greenville County Zoning Ordinance applicable to the site. The next step in the development process was therefore the formal application for a building permit.
 
 
 4
 In mid-March 1978, however, Scott began to hear informally of local opposition to his apartment complex proposal. He arranged with Royce J. Carter, then Acting Executive Director of the County Planning Commission, to meet with two of the private defendants (who were leaders of the citizen opposition), a state senator, one of the County Council defendants, and Carter. Some of the private citizens present raised questions about the desirability of housing minority and low-income residents in the designated neighborhood; aside from airing differences, nothing was resolved at the meeting.
 
 
 5
 The next night, March 21, the Greenville County Council held its regularly scheduled meeting, and Scott's development proposal again sparked much debate. At the time of this meeting, Scott's building site was within an area zoned "RM" for multi-family dwellings such as that proposed by Scott. Consequently, the leaders of the several hundred county residents opposing Scott's plan in attendance at the meeting called on the County Council to rezone the area to R-15, a classification permitting only single family homes. The Council Chairman referred the rezoning matter to the Council's Public Service, Planning and Development Committee. The next day Scott applied for a building permit on the basis of the plans previously reviewed informally.
 
 
 6
 At the same time, the Council committee considering rezoning was formulating a plan to instruct the County Zoning Administrator to direct that the planning commission and other relevant officials halt all processing of building permits for the area in question, i.e., Scott's, which was the only one pending. The committee members, at their March 23 meeting, were informed by Carter that Scott's plans had already been submitted for planning staff review. In addition, the minutes of the meeting show, the county attorney "discussed the ministerial roles of the Planning staff and Zoning Administrator." Nonetheless, the committee, acting for the Council, issued its permit "freeze" order, which was transmitted to lower level officials on March 24. The moratorium on building permits for the area of Scott's project was to continue at least until a planned April 17 hearing on the proposed rezoning. According to Carter's later testimony, this was the only occasion on which he had ever been instructed not to process a designated building permit.
 
 
 7
 One week later Scott filed suit in the Court of Common Pleas for Greenville County seeking an order requiring the issuance of a building permit. Named as defendants were Carter and two other administrative officials. After a hearing before him, Judge Frank Eppes on April 13 issued an order requiring that the permit "immediately issue" to Scott. Judge Eppes found that a permit normally would have been processed and issued in ten days, and that all necessary reviews had been either satisfactorily completed or waived prior to the time of the court hearing on the matter. He went on to note that under the express terms of the zoning ordinance in existence since May 19, 1970, the County Council was barred from involvement in the issuance of particular permits, concluding that there was "no legal basis for the intrusion by the County Council into the zoning certificate and building permit process."
 
 
 8
 An appeal was taken from the ruling by the private defendants in this current action. They were interested landowners in the area who had intervened in the state court suit individually and as representatives of a class of property owners in the vicinity of the proposed apartments. Pursuant to the appeal, the private landowners obtained a Writ of Supersedeas from the Chief Justice of the South Carolina Supreme Court on April 14--the day after Judge Eppes's order--which again suspended the issuance of the permit.
 
 
 9
 On August 15, 1979, nearly seventeen months after Scott's original application, the South Carolina Supreme Court upheld the trial judge's order, adopting it verbatim as the majority opinion for the court. Scott v. Carter, 273 S.C. 509, 257 S.E.2d 719 (1979).[2] In the interim between the trial court order and its affirmance, though, Scott's plans had fallen through, due to the pall cast over the project by the uncertainties of the state court litigation. Scott eventually sold his remaining interest in the project and the site for $162,000.00, a sum which he claims only partially offset several hundred thousand dollars in actual expenses and lost profits. He then filed this action.
 
 II. ISSUES
 
 10
 In the instant suit Scott alleged that the actions of the County Council in conspiracy with the private landowner defendants violated 42 U.S.C. Sec. 1983 as invasions of his Fifth and Fourteenth Amendment rights. He grounded his complaint on three basic constitutional theories: that the withholding of the permit was motivated by a racially discriminatory intent to prevent him from building housing for and renting to members of racial minorities, in violation of the equal protection clause; that, even aside from any racially discriminatory motivation, the withholding of the permit was a deprivation of property without due process; and, that the permit was property, which was taken without just compensation.[3] As relief, he seeks judgment against the County, the Council members individually, and the private landowners in the amount of $300,000.00, a figure representing Scott's estimated losses attributable not only to the initial refusal to issue the permit but also to the complete demise of the project while the matter was delayed on appeal.
 
 
 11
 All defendants moved for summary judgment, raising a plethora of grounds. The district court ruled in their favor on virtually all of them, holding variously that: Scott lacks standing to bring suit; that the county enjoys the state's Eleventh Amendment immunity; that the County Council members enjoy immunity derivative from the state's immunity; that the Council members as individuals enjoy legislative immunity; that the private defendants share the immunity of Greenville County and the Council members and so were not acting "under color of" state law; that the complaint fails to state adequately a claim of racial discrimination; that there was no denial of due process in that Scott at most alleges a state law violation by the Council; that Scott lacked a sufficiently definite interest in the property to assert a taking claim; that Scott's allegations of race discrimination are too highly speculative to present any genuine issues of material fact warranting trial; that Scott's conspiracy claims are equally speculative; and, finally, that the damages claimed are also too speculative to provide a proper basis for a damage award. We will consider these rulings in sequence as raising generally issues of (A) standing, (B) failure to state legally cognizable claims for relief, (C) immunities, and (D) whether genuine issues of material fact are raised by the pleadings and supplementary material.
 
 A. Standing
 
 12
 The district court ruled that Scott lacks standing to assert discrimination claims under Sec. 1983 because Scott is not a member of any racial minority. The district court also relied upon the fact that Scott could not with certainty allege in his complaint or demonstrate in the summary judgment proceedings that members of a minority group would actually live in the housing when built. Neither factor, however, is requisite to Scott's standing, which we conclude is present for the various claims he presses in this suit.
 
 
 13
 Our inquiry into standing involves consideration of "both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise." Warth v. Seldin, 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975). As Warth explains at length, the "minimum constitutional mandate" setting the bounds of standing derives from Article III's requirement that there be a "case or controversy" between federal court litigants. Id. at 499, 95 S.Ct. at 2205. The prudential considerations, "essentially matters of judicial self-governance", focus the standing analysis also on the related but additional question of "whether the constitutional or statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief." Id. at 500, 95 S.Ct. at 2206.
 
 
 14
 The constitutional dimension of standing exists where "the plaintiff has 'alleged such a personal stake in the outcome of the controversy' as to warrant his invocation of federal court jurisdiction and to justify exercise of the court's remedial powers on his behalf." Warth, supra, 422 U.S. at 498-99, 95 S.Ct. at 2205, quoting Baker v. Carr, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962) (emphasis original). The constitutional requirement operates to insure that a particular plaintiff is adequately interested in a justiciable case or controversy. That requirement is satisfied if the plaintiff alleges that he has suffered an injury that "is indeed fairly traceable to the defendant's acts or omissions." Village of Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252, 261, 97 S.Ct. 555, 561, 50 L.Ed.2d 450 (1977); see also Simon v. Eastern Kentucky Welfare Rights Organization, 426 U.S. 26, 38, 96 S.Ct. 1917, 1924, 48 L.Ed.2d (1976). Scott's claimed injuries stem from the denial of a building permit for his proposed multi-family housing complex, and he fairly alleges that denial of the permit was due to the intervention of the defendants in various capacities into the permit issuance process.[4] Thus we think the constitutional requirement of standing has been met.
 
 
 15
 Having satisfied the constitutional requisite, Scott must also possess a personal stake in the particular rights for which he seeks relief. Contrary to the district court's belief, standing to assert that discriminatory government action violated the equal protection clause is not lacking simply because the plaintiff is not a member of a minority. In the first place, Scott as the developer is a proper plaintiff to assert the rights of prospective minority tenants victimized by the alleged racial discrimination. See Fralin & Waldron, Inc. v. County of Henrico, Va., 474 F.Supp. 1315, 1321-22 (E.D.Va.1979);[5] Park View Heights Corp. v. City of Black Jack, 467 F.2d 1208, 1213 (8 Cir.1972).
 
 
 16
 More importantly, if defendants singled out Scott for disadvantageous treatment because of his willingness to house minority tenants, then Scott in his own stead suffered injury to his right to be free from official discrimination. Judge Wyzanski, speaking for the First Circuit, stated the principle well in Des Vergnes v. Seekonk Water District, 601 F.2d 9, 17 (1 Cir.1979), cert. denied, 454 U.S. 898, 102 S.Ct. 398, 70 L.Ed.2d 213 (1980):
 
 
 17
 "Few principles of law are more firmly stitched into our constitutional fabric than the proposition that a State must not discriminate against a person because of his race or the race of his companions, or in any way to compel or encourage racial segregation." Adickes v. Kress & Co., 398 U.S. 144, 151-52, 90 S.Ct. 1598, 1605, 26 L.Ed.2d 142 (1970). Therefore a State may not punish a non-white for having social contacts with a black. Ibid. Likewise it may not through one of its creatures, punish or discriminate against a corporation for its willingness, past or present, to make contracts with blacks. And if it does so, then the person so punished or discriminated against has a Sec. 1983 right of action. Crow v. Brown, 457 F.2d 788 (5th Cir.1972) aff'g 332 F.Supp. 382, 384 (N.D.Ga.1971); Dailey and Columbia Sq. Inc. v. City of Lawton, Okl., supra [425 F.2d 1037 (10th Cir.1970) ], at p. 1038.
 
 
 18
 That the corporate developer in Des Vergnes could be found to have standing to allege injurious discrimination underscores Scott's standing here to raise his own equal protection claim under Sec. 1983.[6] Cf. Winston v. Lear-Siegler, Inc., 558 F.2d 1266 (6 Cir.1977); DeMatteis v. Eastman Kodak Co., 511 F.2d 306, modified, 520 F.2d 409 (2 Cir.1975); Faraca v. Clements, 506 F.2d 956 (5 Cir.) (claim of race discrimination under Sec. 1981 by white member of interracial couple), cert. denied, 422 U.S. 1006, 95 S.Ct. 2627, 45 L.Ed.2d 669 (1975).
 
 
 19
 Scott also need neither allege nor show that members of a minority group will in fact reside in the proposed housing in order to satisfy standing requirements. The heart of Scott's racial discrimination claim is that he was singled out for adverse treatment because defendants believed he was willing to contract with and otherwise associate with blacks and other minorities through the building of low-income housing. If allegations that public officials were motivated by racial animus in harming the plaintiff-developer were not themselves enough to confer standing under Sec. 1983, then such officials could almost uniformly foreclose potential liability by successfully destroying the proposed development's prospects at a stage too early for actual occupancy to be ascertained. The uncertainty surrounding carrying any large-scale housing development to fruition[7]--even assuming all public approvals--has not undermined the standing of developers who could not guarantee actual patronage by minorities. See Des Vergnes, supra, 601 F.2d at 13-14, 17; Riccobono v. Whitpain Township, 497 F.Supp. 1364, 1373 (E.D.Pa.1980) (businessman had standing where "injured because defendants believed he was willing to contract and do business with members of minority groups ... [,] an as yet unidentifiable group of people"); cf. Hudson Valley Freedom Theater, Inc. v. Heimbach, 671 F.2d 702, 706 (2 Cir.), cert. denied, --- U.S. ----, 103 S.Ct. 127, 74 L.Ed.2d 110 (1982).
 
 B. Substantive Claims
 
 20
 (i) Equal Protection
 
 
 21
 That the main thrust of Scott's complaint states a claim of a denial of equal protection actionable under Sec. 1983 is beyond doubt. His central allegation is that the County Council, in conspiracy with the private landowners, acted with racially discriminatory intent when it directed the withholding of his building permit. Despite the great deference accorded local officials in zoning and land use matters, their decisions and official actions are not exempt from the constitutional command to be free of racial discrimination. Racially discriminatory local land use decisions of various kinds have long been struck down or found actionable under the Equal Protection Clause. See, e.g., Progress Development Corp. v. Mitchell, 286 F.2d 222 (7 Cir.1961) (discriminatory condemnation to prevent integrated housing development); Kennedy Park Homes Association v. City of Lackawanna, 436 F.2d 108 (2 Cir.1970), cert. denied, 401 U.S. 1010, 91 S.Ct. 1256, 28 L.Ed.2d 546 (1971) (rezoning undertaken upon learning of plans for low-income housing project). And there has been no doubt since Arlington Heights signalled that intent must be shown that racially discriminatory zoning or land use decisions continue to be actionable constitutional wrongs. See Des Vergnes, supra, 601 F.2d at 17; Fralin & Waldron, supra, 474 F.Supp. at 1319.
 
 
 22
 Scott's claim raises more difficult issues with respect to the scope of the actionable wrongs and the involvement of the non-governmental defendants. Scott would have us view all consequences of the initial permit denial as attributable to a racially discriminatory conspiracy for which all defendants would be liable, and to consider the delay between appeal and decision in the South Carolina Supreme Court as a foreseeable consequence of the initial denial for which damages would be warranted under traditional tort principles. The question thus raised by these allegations is whether any or all of the defendants can be held liable in damages for harm resulting from the continued unavailability of Scott's permit during the appeal, even assuming the appeal was at least in part taken out of a discriminatory animus. On the basis of the allegations and record before us, we resolve this question in favor of the defendants.
 
 
 23
 In general, the right to vindication through litigation, including the prosecution of an appeal, is a corollary of fundamental rights of citizenship. This right should not be unduly burdened by the threat of heavy monetary liability if a party's legal position eventually loses. Cf. Sierra Club v. Butz, 349 F.Supp. 934 (N.D.Cal.1972). Yet the right to litigate or appeal is not absolutely privileged. One ready illustration is Rule 38 of the Federal Rules of Appellate Procedure, which allows a court of appeals, even without a trial on the merits, to "award just damages and single or double costs to the appellee" where the appeal is "frivolous." An award of costs is in essence compensation to the appellee for unjustified delay, and may even be punitive in nature if doubled. We have seen fit many times in the past to award costs when appeals were taken for the purpose of delaying some benefit rightly due to the appellee, particularly where we discerned a racially discriminatory motivation prompting the delaying tactics. See, e.g., Eaton v. New Hanover County Board of Education, 459 F.2d 684, 686 (4 Cir.1972) (in banc) (per curiam); Brewer v. School Board of City of Norfolk, Virginia, 456 F.2d 943 (4 Cir.), cert. denied, 409 U.S. 892, 93 S.Ct. 109, 34 L.Ed.2d 149 (1972); see generally, Wright, Miller, Cooper & Gressman, Federal Practice and Procedure: Jurisdiction Sec. 3984 (1977).
 
 
 24
 Nonetheless, there is no basis upon which Scott could prove in this case that the taking of the appeal and, more precisely, the obtaining of a Writ of Supersedeas freezing the status quo pending appeal, were legally "frivolous." Were it not for the issuance of the Writ suspending the trial court order, Scott would have been able to obtain his permit from the local authorities,[8] thereby limiting the duration of the period for which he could claim injury from the initial denial. The Writ issued, however, upon a decision of a single justice of the South Carolina Supreme Court and was later continued by order of the full court. See Scott v. Carter, supra, 257 S.E.2d at 725.
 
 
 25
 Under these circumstances, the Writ cannot be said to have been obtained frivolously.[9] Scott has in no way suggested that he lacked an opportunity to present to the South Carolina Supreme Court the argument that the appeal was discriminatorily motivated or that the Writ would serve an illegitimate purpose. Accordingly, absent some overriding circumstance not present here, we defer to the apparent judgment of the state court that the application for the Writ was not baseless or made for the predominant purpose of aggravating any injury already suffered by Scott. Therefore, the scope of Scott's Sec. 1983 action will be limited to recovery only for damages attributable to the withholding of his permit until April 14, 1978.
 
 
 26
 (ii) Due Process
 
 
 27
 As an independent ground for recovery, Scott alleges that, even if he fails to prove racially discriminatory motivation, the Council's treatment of his individual permit application denied him a protected property interest without the due process of law guaranteed by the Fourteenth Amendment. Scott asserts that he enjoyed a vested interest legitimately entitling him to the issuance of a building permit under the zoning ordinance in effect at the time of his application. See Board of Regents v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). His claim is that the Council's intervention into the process was motivated by a lack of impartiality towards him, and was such a departure from established practice and applicable law that he was denied due process.
 
 
 28
 The starting point for our inquiry is to determine whether state or local law afforded Scott a "protectible property interest in the permit" sufficient to trigger federal due process guarantees. United Land Corp. of America v. Clarke, 613 F.2d 497, 501 (4 Cir.1980). Under South Carolina law settled well before he applied for the building permit, Scott enjoyed an entitlement to the issuance of a permit upon presentation of an application and plans showing a use expressly permitted under the then-current zoning ordinance. Niggel v. City of Columbia, 254 S.C. 19, 173 S.E.2d 136, 137-38 (1970); Pure Oil Division v. City of Columbia, 254 S.C. 28, 173 S.E.2d 140, 142 (1970). This entitlement extended to Scott even though he held only an option to purchase the property or similar interest, rather than actual legal title. See, e.g., Abbeville Arms v. City of Abbeville, 273 S.C. 491, 257 S.E.2d 716 (1979).
 
 
 29
 There is no refutation, particularly in light of the subsequent state court proceedings, of the fact that Scott's plans for a multi-family housing project fully complied with the requirements of the zoning ordinance in effect as of the date on which he formally applied. Moreover, under South Carolina law, even the publicly announced intention of the County Council to reconsider the zoning of the area in which Scott proposed to build could not undermine his entitlement to a permit, as "vested rights acquired under a zoning ordinance in effect at the time of the application will be protected against a change in the zoning ordinance." Pure Oil, supra, 173 S.E.2d at 142.[10] Scott therefore held a cognizable property interest, rooted in state law, to which federal due process protection extended.[11]
 
 
 30
 Having determined that Scott correctly claims a constitutionally protected property interest, we must now consider whether its deprivation was attended by that process which was Scott's due. Logan v. Zimmerman Brush Co., 455 U.S. 422, 428, 102 S.Ct. 1148, 1153, 71 L.Ed.2d 265 (1982); Detweiler v. Commonwealth of Virginia Department of Rehabilitative Services, 705 F.2d 557, 559 (4 Cir.1983). The record unequivocally establishes that Scott was deprived of his building permit by the extraordinary[12] and unlawful intervention of the county's highest governing body into the issuance process. The South Carolina Supreme Court, adopting its trial court's finding of fact, determined that the County Council acted through its subordinate Zoning Administrator to call a halt to what should otherwise have been the routine issuance of a permit. Scott v. Carter, supra, 257 S.E.2d at 722. The state supreme court further embraced the conclusion that there was "no basis for the intrusion by the County Council into the zoning certificate and building permit process." Id. Indeed, by involving itself in what should have been the ministerial administration of its prior zoning legislation the County Council directly contravened an express section of its own zoning ordinance.[13]
 
 
 31
 Federal courts have understandably shown a reluctance to sit as " 'zoning board[s] of appeals' " when presented with claims which, though couched in constitutional language, at bottom amount only to "the run of the mill dispute between a developer and a town planning agency." Creative Environments, Inc. v. Estabrook, 680 F.2d 822, 833 (1 Cir.), cert. denied, --- U.S. ----, 103 S.Ct. 345, 74 L.Ed.2d 385 (1982). Nonetheless, it has been recognized that zoning action which is "tainted with fundamental procedural irregularity, racial animus, or the like" does amount to an actionable denial of due process. Id.; cf. South Gwinnett Venture v. Pruitt, 491 F.2d 5, 7 (5 Cir.1974) (in banc) (dictum) (zoning reclassification, normally not subject to federal court scrutiny, may violate due process where "the action of the zoning commission is arbitrary and capricious"), cert. denied, 419 U.S. 837, 95 S.Ct. 66, 42 L.Ed.2d 64 (1974). As we suggested in United Land Corp., supra, 613 F.2d at 501, where there is fairly alleged a basis for finding either "abuse of discretion [or] caprice in [a] zoning administrator's refusal to issue" a building permit, a Fourteenth Amendment claim is properly stated.
 
 
 32
 Arbitrariness, abuse of discretion, caprice or unfairness giving rise to a constitutional claim has been found by other courts in various forms of official permit processing actions. For example, in Cordeco Development Corp. v. Vasquez, 539 F.2d 256, 260 (1 Cir.), cert. denied, 429 U.S. 978, 97 S.Ct. 488, 50 L.Ed.2d 586 (1976), the First Circuit affirmed a ruling that local officials had committed a constitutional violation by singling out a permit applicant for adverse treatment due to "illegitimate 'political' or, at least, personal motives." Such "purposeful discrimination" against a particular individual was held to violate the Constitution even where no recognized class-based or invidious discrimination was involved.[14]
 
 
 33
 Another court similarly rejected a motion to dismiss a Sec. 1983 claim based upon a refusal by local officials to issue a building permit for a proposed development under circumstances similar to those alleged here by Scott. As the court succinctly noted:
 
 
 34
 While defendants are undoubtedly correct in asserting that challenges to local zoning decisions are rarely successful outside of the context of racial discrimination, ... the primary distinction between winning and losing cases is the sufficiency of the evidence and not that the claim is not facially viable under the Civil Rights Act .... Regardless of the deference normally accorded zoning practices by the courts, the Constitution does not tolerate arbitrary and unreasoned action.
 
 
 35
 Altaire Builders, Inc. v. Village of Horseheads, 551 F.Supp. 1066, 1069 (W.D.N.Y.1982) (citations omitted).[15] And an analogous result was reached in Wilkerson v. Johnson, 699 F.2d 325 (6 Cir.1983), where members of a state barber licensing board were found to have denied the plaintiff due process in refusing a license to a potential competitor of one board member. "The regular and impartial administration of public rules governing [liberty and property] interests, as required by due process, prohibits the subtle distortions or prejudice and bias" even where no class-based or other generalized invidious discrimination motivates the adverse treatment of a particular applicant. Id. at 328.
 
 
 36
 In the instant case the evidence indicates that the Council's moratorium on building permits was limited to the area in which Scott proposed to build, and that his was the only application pending in that area. It therefore appears that the moratorium was directed solely to him. Moreover, the city's zoning ordinance purported to remove all zoning enforcement powers from the County Council, reserving to it only the authority to consider and adopt or reject proposed amendments or to repeal the ordinance in its entirety (i.e., act legislatively).[16]
 
 
 37
 Thus we consider meritorious Scott's contention that, even if he fails to prove racially discriminatory motivation, he has been denied due process of law. Scott's property interest was taken from him by manifest arbitrariness and unfairness. Defendant's reliance on United Land Corp., supra, 613 F.2d at 501, is unfounded, as there under the state law in question the plaintiff "had no protectible property interest" in a permit prior to the rezoning action which held up its issuance. We also reject the suggestion that there is no evidence showing the Council's action to have been extraordinary, extralegal, and in derogation of its regular practice of non-involvement in permit issuance. We do not, of course, decide that Scott's allegations are in all respects true, but we do find triable issues of fact which, if found in Scott's favor, support his theory of liability.[17]
 
 
 38
 (iii) Taking
 
 
 39
 Whether Scott has alleged a valid taking claim depends upon whether it is the permit or instead the land on which the permit was to be used that should be viewed as the property taken. Where a previously valid permit has issued and construction begun, a subsequent rezoning that effectively revokes permission to build is a confiscatory taking of the permit itself. Wheeler v. City of Pleasant Grove, 664 F.2d 99 (5 Cir.1981), cert. denied, 456 U.S. 973, 102 S.Ct. 2236, 72 L.Ed.2d 847 (1982). Here, however, the permit never actually issued.[18]
 
 
 40
 Although we view Scott as having held an entitlement to permit issuance which was sufficiently a "species of property" to require constitutional protection,[19] the permit, until it is at least actually in hand, is not in the nature of interests the deprivation of which is encompassed by the Fifth Amendment "takings" doctrine.[20] While Scott's right to the permit prior to issuance is entitled to protection under the due process clause, non-issuance of the permit did not effectively destroy the value of the building site, the rights to which Scott eventually sold. Therefore, we conclude that Scott has no taking claim.
 
 C. Immunities
 
 41
 (i) Eleventh Amendment
 
 
 42
 The district court was plainly in error when it ruled that Greenville County derived immunity from the state's possible Eleventh Amendment immunity. Logan v. Shealy, 660 F.2d 1007, 1015 (4 Cir.1981), cert. denied, 455 U.S. 942, 102 S.Ct. 1435, 71 L.Ed.2d 653 (1982); Lytle v. Comm. of Elections of Union County, 541 F.2d 421, 426 (4 Cir.1976), cert. denied, 438 U.S. 904, 98 S.Ct. 3122, 57 L.Ed.2d 1147 (1978); see also Owen v. City of Independence, 445 U.S. 622, 638, 100 S.Ct. 1398, 1409, 63 L.Ed.2d 673 (1980); Monell v. Department of Social Services of the City of New York, 436 U.S. 658, 690, 98 S.Ct. 2018, 2035, 56 L.Ed.2d 611 (1978). Nor could the state envelop the county in its immunity by express enactment or through the peculiarities of local law, as the district court also supposed.[21] See Markham v. City of Newport News, 292 F.2d 711, 716 and n. 23 (4 Cir.1961). Therefore the suit may proceed against Greenville County, and against the Council members in their official capacities.
 
 
 43
 (ii) Private-Party Derivative Immunity
 
 
 44
 The district court was also in error when it held that private parties who conspire with immune public officials cannot be liable under Sec. 1983. This proposition was rejected in Dennis v. Sparks, 449 U.S. 24, 101 S.Ct. 183, 66 L.Ed.2d 185 (1980). As the Third Circuit has summarized the current state of the law:
 
 
 45
 It is now settled that private persons who willfully participate in joint action with a state official act under the color of law within the meaning of Sec. 1983, notwithstanding the official's immunity from civil liability.
 
 
 46
 Black v. Bayer, 672 F.2d 309, 318 (3 Cir.), cert. denied, --- U.S. ----, 103 S.Ct. 230, 74 L.Ed.2d 182 (1982).
 
 
 47
 (iii) Legislative Immunity
 
 
 48
 In Bruce v. Riddle, supra, we recognized absolute personal immunity for county legislators, provided they could establish: (1) that as council members they were "function[ing] in a legislative capacity" when doing the acts complained of; and (2) that their acts were not "[i]llegal acts such as bribery [which] are obviously not in aid of legislative activity and [for which] legislators can claim no immunity." 631 F.2d at 279. Only the first of these two preconditions is at issue here. That condition depends upon a functional test such as that applied in Bruce, and which was well elaborated in a case analogous to this one. In Fralin & Waldron, Inc., supra, a developer brought a civil rights suit against a county, its board of supervisors, and its planning commission, alleging that various unconstitutional acts were committed in the course of a zoning change and a concomitant refusal to issue a building approval permit. With respect to the initial consideration and passage of the zoning change, both the board and the commission were held absolutely immune on the theory that their actions were legislative. However, "inasmuch as the complaint against the Board of Supervisors alleges conduct beyond that necessary to perform their duties in establishing zoning policies, the Board of Supervisors is subject to suit under Secs. 1983 and 1985(3)." 474 F.Supp. at 1320. The same was true of the planning commission members, as "such immunity does not extend to their executive actions in enforcing the zoning change by refusing to approve plaintiff's P[lan] O[f] D[evelopment] or in their alleged attempts to hinder construction of plaintiff's housing project by communication with plaintiff's bank." Id. at 1321 (emphasis added).
 
 
 49
 The County Council naturally portrays all of its actions in dealing with Scott as part and parcel of legislative deliberations on a zoning policy issue. However, the South Carolina Supreme Court considered the Council's actions as functionally in the nature of executive review of a specific building permit application, thus outside the Council members' range of legitimate legislative duties.[22] When local zoning officials do more than adopt prospective, legislative-type rules and take the next step into the area of enforcement, they can claim only the executive qualified immunity appropriate to that activity.[23] As the Eighth Circuit has explained:
 
 
 50
 As to some reclassifications of property, then, it might be argued that municipal legislators have only a qualified immunity because they exercise only a limited discretion and do not operate under the legislator's duty to "conceive public policy from the myriad policy options open to the sovereign." Adler v. Lynch, 415 F.Supp. 705, 712 (D.Neb.1976).
 
 
 51
 Gorman Towers, Inc. v. Bogoslavsky, 626 F.2d 607, 611 n. 5 (8 Cir.1980) [citing City of Eastlake v. Forest City Enterprises, Inc., 426 U.S. 668, 683-85, 96 S.Ct. 2358, 2366-67, 49 L.Ed.2d 132 (1976) (Stevens, J., dissenting opinion noting state court decisions to this effect) and Developments in the Law, Zoning, 91 Harv.L.Rev. 1427, 1508-13 (1978) ].
 
 
 52
 Because the County Council's members assumed non-legislative roles in dealing with Scott's permit application, legislative immunity does not extend to them. See, e.g., Altaire Builders, Inc., supra, 551 F.Supp. at 1072-75; Riccobono v. Whitpain Township, supra, 497 F.Supp. at 1376; Kinderhill Farm Breeding Associates v. Appel, 450 F.Supp. 134, 136 (S.D.N.Y.1978); cf. Rogin v. Bensalem Township, supra, 616 F.2d at 694 (dictum) (local officials' actions were "administrative in nature because they involved application of the Township's general zoning policies--as manifested in the [recently passed] amendments--to a particular parcel of land"). The Council members instead are entitled only to consideration of a defense of qualified immunity under the standards set forth in Harlow v. Fitzgerald, --- U.S. ----, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).[24]
 
 D. Factual Issues
 
 53
 (i) Race Discrimination
 
 
 54
 Scott alleged in his complaint that the Council members believed that minority group members would occupy his proposed housing complex, and that they intended to prevent the benefits of the housing to those minorities by denying Scott a building permit. For purposes of this appeal, Scott is entitled to have his allegations accepted as true. Only if the moving parties present material in compliance with Rule 56(e) contradicting his material allegations is Scott then required to come forward with affidavits, depositions, or other sufficiently verified and detailed evidence in support of his allegations in order to withstand a motion for summary judgment. See generally 10A Wright, Miller & Kane, Federal Practice & Procedure: Civil 2d Sec. 2739 at 523-29 (1983). Before us we have only defendants' outright denials of Scott's allegation of race discrimination; instead of negating the need for a trial, this pattern of allegation and denial is the paradigmatic situation out of which genuine triable issues of fact emerge.
 
 
 55
 Additionally, although defendants contend that Scott's claim is founded on nothing more than idle speculation, the record reveals something more. That the project was locally undesirable because low-income housing would attract a large percentage of minority group residents was a basis for permit denial repeatedly pressed upon the Council throughout the controversy. For example, Scott in his deposition testified that at the informal March 20 meeting with one Council member present, there was explicit discussion and concern by those opposing the apartment complex that "minorities" would live there; and the Council member seemed to be learning of the nature of the project for the first time. Planning Commission Acting Director Carter testified that citizen complaints to his office sometimes objected to the racial composition of the expected mix of occupants. On motion for summary judgment, Scott is entitled to have the inference drawn in his favor that these racial concerns--and not the objections to congestion or waste disposal capacity that the state court found without factual merit--prompted the extraordinary Council action. Proof of a discriminatory intent is rarely had on direct evidence, particularly when as here the depositions of the majority of defendants have yet to be taken.
 
 
 56
 (ii) Conspiracy
 
 
 57
 By way of contrast to the race discrimination claim is the lack of material facts at issue with regard to the alleged conspiracy between the private defendants and the public officials. In his deposition, Scott explained that he based his charge of conspiracy on essentially two sets of activities by the private defendants: their attempts to influence Council action, and their intervention into the state court lawsuit. We have already rejected the latter as a basis for any defendant's liability. As to the former, Scott specifically testified:
 
 
 58
 Q. You have alleged that as a result of this option that there was some conspiracy between members of county council and property owners in that area.
 
 
 59
 A. Well, they joined with county council in trying to defeat this, and they wrote letters, both to the county and to HUD, citizens in the area did.
 
 
 60
 Q. Is there anything else that you're aware of?
 
 
 61
 A. No.
 
 
 62
 Q. So you base that allegation upon the basis that the property owners or some of the property owners in that area appealed to county council to rezone this property?
 
 
 63
 A. Well, not only appeal. As I say, they intervened into the lawsuit, and they intervened into it, kept a lawsuit going through the Supreme Court.
 
 
 64
 It follows from our holding in Bruce v. Riddle, supra, 631 F.2d at 279-80, that even overtly biased citizens who write letters, speak up at public meetings, or even express their prejudices in private meetings with public officials without formulating a joint plan of action are not "conspiring" with those officials in a way that subjects them to Sec. 1983 liability. While the general rule is surely that "[t]he existence or nonexistence of a conspiracy is essentially a factual issue that the jury, not the trial judge, should decide [,]"[25] the only basis advanced for finding a conspiracy here is not a legally material one. Summary judgment dismissing the private landowner defendants under the conspiracy allegations therefore was proper.
 
 
 65
 (iii) Damages
 
 
 66
 As discussed in relation to standing in Section II-A, supra, a developer's economic interest in profits flowing from successful completion of a housing development is not too highly speculative to merit judicial protection.[26] Scott's claim to a personal loss of $300,000.00 in net out-of-pocket expenses and lost profits may prove inaccurate; his losses are certainly offset by his share of the $162,000.00 he conceded was recouped from the sale of all rights in the housing project to another developer. But the fact that plaintiff may ask too much does not indicate that he cannot prove with reasonable certainty actual loss attributable to defendants' conduct. Inasmuch as we hold that Scott is limited to recovery for those injuries fairly traceable to the withholding of the permit until April 14, 1978, Scott's claim for damages will be sufficiently circumscribed to avoid the pitfalls of which defendants complain. Therefore, summary judgment should not have been granted on this ground either.
 
 III.
 
 67
 We summarize our disposition of this appeal. Scott has standing to bring this suit. The dismissal of the private landowner defendants Ashmore, Peddycord and Farmer as parties to this action is affirmed, as is the dismissal of Scott's claim of a taking without just compensation. The judgment in favor of the remaining defendants on Scott's equal protection and due process Sec. 1983 claims is reversed. Also reversed are the grants of immunity to Greenville County and to the County Council members in their official capacities, although in their individual capacities the Council members will be entitled to raise a defense of qualified immunity.
 
 
 68
 AFFIRMED IN PART; REVERSED IN PART, AND REMANDED.
 
 
 
 [1]
 The housing development was planned as one in which federal subsidies would guarantee the owner a fair market rent for each unit occupied by a low-income or other eligible tenant while requiring the tenant to pay only a portion of the rent, up to a maximum percentage of the tenant's gross income. This type of subsidy is commonly known as Section 8, as the statutory authority for it comes from Sec. 8 of the U.S. Housing Act of 1937, as amended by Sec. 201(a) of the Housing and Community Development Act of 1974, 42 U.S.C. Sec. 1437f (1970 3d., Supp. V) and by the Housing Authorization Act of 1976, Sec. 2, 90 Stat. 1068
 Although funds were only non-contractually set aside for the project prior to Scott's applying for a building permit, typically no more formal contractual commitment is given by H.U.D. until later in a project's development. The lack of such a formal commitment, however, does not make the project too speculative for the developer to have legally protected interests in its completion. See, e.g., Village of Arlington Heights v. Metropolitan Housing Development Corporation, 429 U.S. 252, 255 n. 2, 261-62, 97 S.Ct. 555, 558, n. 2, 561, 50 L.Ed.2d 450 (1977).
 
 
 [2]
 One Justice, however, dissented on the merits of Scott's right to a permit, while another would have dismissed the suit as moot due to the stated willingness of the public officials to issue a permit as of May 4, 1978, except for being prohibited from doing so by the Writ of Supersedeas
 
 
 [3]
 Scott also alleged a parallel state law taking claim based upon the Constitution of the State of South Carolina. However, he does not press his state constitutional claim in his brief or in oral argument and we will not consider it
 
 
 [4]
 We recognize, of course, that untested allegations purporting to confer standing on a plaintiff may in some circumstances call for "further particularized allegations of fact" such that "plaintiff's standing [will] adequately appear from all materials of record." Warth, supra, 422 U.S. at 501-02, 95 S.Ct. at 2207. We see no deficiencies in Scott's pleadings with respect to standing that would have required such supplementation in the face of defendants' motions for summary judgment
 
 
 [5]
 Fralin carefully analyzed this issue of third-party standing, discussing the prior Supreme Court cases cited by Justice Powell when the Court reserved the question in Arlington Heights, supra, 429 U.S. at 263-64, 97 S.Ct. at 562. The Fralin analysis is convincing on the issue; some courts, though, have chosen to rest on only the additional ground we next articulate. See, e.g., West Zion Highlands v. City of Zion, 549 F.Supp. 673, 677 (N.D.Ill.1982)
 
 
 [6]
 The district court did not differentiate in its ruling on standing among Scott's various claims. With respect to his other allegations under Sec. 1983 that there was a "taking" of his property and that the intervention into the permit process was, even absent racial animus, a denial of due process, there can be no doubt that as the developer-applicant for a building permit he suffered palpable injury by its denial. We therefore also hold that Scott has standing to litigate these other Sec. 1983 claims
 
 
 [7]
 See Arlington Heights, supra, 429 U.S. at 261, 97 S.Ct. at 561, explaining that judicial relief "would not, of course, guarantee that [the proposed housing project] would be built. [The developer] would still have to secure financing, qualify for federal subsidies, and carry through with construction. But all housing developments are subject to some extent to similar uncertainties." See also Huntington Branch, N.A.A.C.P. v. Town of Huntington, 689 F.2d 391 (2 Cir.1982) (lack of Section 8 federal subsidy funds does not destroy plaintiffs' stake in housing project), cert. denied, --- U.S. ----, 103 S.Ct. 1523, 75 L.Ed.2d 947 (1983)
 
 
 [8]
 Defendants suggest that Scott waived any right to recover for injury occurring after April 13, 1978, due to his failure instantly to procure the permit under the authority of the trial court order issued on that date. We reject this argument. We see no fault on Scott's part in not attempting to outrace defendants and the courts. Defendants took their appeal and applied for a Writ of Supersedeas the very next day
 
 
 [9]
 In utilizing this standard, we are guided by the conceptually analogous principles applied where it is alleged that resort to the courts or administrative agencies is had for the primary purpose of causing economic injury to a competitor. Compare Railroad Presidents Conference v. Noerr Motor Freights, Inc., 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), with, California Motor Transport Co. v. Trucking Unlimited, 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972). Cf. Gorman Towers, Inc. v. Bogoslavsky, 626 F.2d 607, 615 (8 Cir.1980)
 
 
 [10]
 Subsequent to the events complained of, the Supreme Court of South Carolina clarified the law insofar as it recognized that rezoning legislation pending as of the time the permit application is made may defeat the applicant's claim of a vested right to a permit. Sherman v. Reavis, 273 S.C. 542, 257 S.E.2d 735 (1979). However, the court carefully delineated that "[a]n ordinance is legally pending when the governing body has resolved to consider a particular scheme of rezoning and has advertised to the public its intention to hold public hearings on the rezoning." Id., 257 S.E.2d at 737 (emphasis added). In Sherman and the cases it cites, the particular rezoning proposal under consideration had already been recommended in detail to the city council by its planning staff and thus had reached "an advanced stage" of the statutory procedure prescribed for rezoning. Id. at 736. Here, by contrast, the County Council's purported generalized interest in rezoning had not even reached the first statutory step, i.e., the referral of the matter for full consideration to the county zoning and planning commission, which did not take place until several days after Scott had applied for his permit. See Sec. 4-27-160, Code of Laws of South Carolina 1976. Notably, the case authority from Pennsylvania upon which the South Carolina Supreme Court based its adoption of the "pending ordinance" doctrine flatly rejected the view that an ordinance could be considered pending as of the time the governing body first announced an intention to consider rezoning and refers the matter to its zoning commission. Casey v. Zoning Hearing Board of Warwick Township, 459 Pa. 219, 328 A.2d 464, 467 (1974)
 Even if the County Council's March 21, 1978, referral of the question of the rezoning of the area containing Scott's parcel to its own committee could be considered to have initiated a "pending" rezoning, the law of South Carolina at that time was, and continues to be, that persons "who have relied in good faith on the right to use property as permitted under zoning ordinances in force at the time application was made" are deemed to have a vested right to a permit not defeasible by the pendency of a lawful rezoning. Sherman, supra, 257 S.E.2d at 737 [citing Pure Oil, supra, and Kerr v. City of Columbia, 232 S.C. 405, 102 S.E.2d 364 (1958) ]; see also, Byrd v. City of North Augusta, 261 S.C. 591, 201 S.E.2d 744, 746 (1974). Scott's substantial expenditures in preparation for obtaining the permit and pursuing the then-conforming low-income housing project, coupled with prior official knowledge and informal approval of his intention to build such housing, see City Ice Delivery Co. v. Zoning Board of Adjustment for Charleston County, 262 S.C. 161, 203 S.E.2d 381 (1974), more than amply entitled him to claim a "vested right" to a permit despite any initiation of rezoning contemporaneous with his application. Cf. Gifford-Hill & Company, Inc. v. Harrison, 229 Ga. 260, 191 S.E.2d 85, 89 (1972) ("[A] governing authority cannot deny or postpone requested authorization to use the land for a permitted use and then defeat the applicant's right by thereafter rezoning the land.")
 
 
 [11]
 Consequently, this case is distinctly different from C.F. Lytle Co. v. Clark, 491 F.2d 834 (10 Cir.1974), where a developer began construction with a permit issued under a prior zoning ordinance, the ordinance was amended to make his project non-conforming, and then, the first permit having expired due to the developer's abandonment of the project, he was denied a second permit under the new ordinance. As Lytle noted in finding no due process violation there, "[h]ad appellant [instead] continued construction it would have been permitted to complete the project, regardless of the change in the zoning laws." Id. at 838
 
 
 [12]
 That the Council's intervention was unprecedented was attested to by Royce J. Carter, Planning Commission Acting Director at the time, who stated in deposition testimony that to his knowledge there had never before been a similar directive from the Council to the administrative staff barring the issuance of a permit to a particular applicant. Nor could Frank Ellenburg, County Administrator since 1976, recall any similar directive ever issuing even through the time of his deposition in March 1982
 
 
 [13]
 Section 9.9 of the Greenville County Zoning Ordinance adopted May 19, 1970, and in force in March 1978, stated:
 It is further the intent of this Ordinance that the duties of the County Council in connection with this Ordinance shall not include hearing and deciding questions of interpretation and enforcement that may arise. The procedure for deciding such questions shall be as stated in this section and this Ordinance. Under this Ordinance, the County Council shall have only the duty of considering and adopting or rejecting proposed amendments or the repeal of this Ordinance, as provided by law.
 Scott v. Carter, supra, 257 S.E.2d at 722.
 
 
 [14]
 Although Cordeco speaks technically of a denial of equal protection by "purposeful discrimination," it fits more broadly into a line of cases addressing the substantive unfairness of the process by which governmental actors deprive a citizen of a protected interest. See 539 F.2d at 260 n. 5 and cases collected therein; see also Sternaman v. County of McHenry, 454 F.Supp. 240, 250 (N.D.Ill.1978) (both equal protection and due process denied by "arbitrary and capricious" refusal to renew permit of particular disfavored non-minority applicant)
 
 
 [15]
 Much the same was held in Bennett v. City of Slidell, 697 F.2d 657 (5 Cir.), reh. in banc granted, 706 F.2d 533 (1983). There the Fifth Circuit upheld a jury verdict finding due process and equal protection violations by a city and one of its agents in a Sec. 1983 suit based upon the arbitrary and harassing way in which defendants had withheld issuance of a liquor license and building occupancy permit to a non-minority applicant
 
 
 [16]
 The Council's characterization of its actions here as purely legislative is not binding on us. An analogous case on this point is Bayou Landing Ltd. v. Watts, 563 F.2d 1172 (5 Cir.1977), cert. denied, 439 U.S. 818, 99 S.Ct. 79, 58 L.Ed.2d 109 (1978). There, a city council claimed that it had acted legislatively when it rezoned a particular area and concomitantly directed the withholding of a building permit to which the plaintiff would have been entitled under the previous ordinance. The Fifth Circuit rejected this claim, explaining:
 Here, there are strong indications that the resolution was not a zoning ordinance. The resolution was directed at only one business, instead of being of general applicability, even though "rezoning on a piecemeal or spot basis is highly suspect." Four States Realty Co., Inc. v. City of Baton Rouge, 309 So.2d 659, 672 (La.1975). See also 101 C.J.S. Zoning Sec. 34. The resolution was not prospective, but instead acted to penalize that establishment after it became known that it was selling certain material. (emphasis in original).
 Accordingly, the Council's attempt at rezoning is not saved as one genuinely intended to be of general application but which incidentally burdens a particular landowner more heavily than others to be covered by the legislative enactment. See, e.g., Rogin v. Bensalem Township, 616 F.2d 680 (3 Cir.1980), cert. denied, 450 U.S. 1029, 101 S.Ct. 1737, 68 L.Ed.2d 223 (1981); compare Londoner v. Denver, 210 U.S. 373, 28 S.Ct. 708, 52 L.Ed. 1103 (1908), with Bi-Metallic Investment Co. v. State Board of Equalization of Colorado, 239 U.S. 441, 36 S.Ct. 141, 60 L.Ed. 372 (1915).
 
 
 [17]
 Defendants also argue in effect that the availability of state court postdeprivation relief precludes a due process action under Sec. 1983; essentially they hope to extend the doctrine now associated with Parratt v. Taylor, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981). But the Parratt analysis at most addresses "random and unauthorized", 451 U.S. at 541, 101 S.Ct. at 1916, derelictions by officials of the lowest level, resulting in deprivations which are in no sense of the term systemic. In Palmer v. Hudson, 697 F.2d 1220, 1222 n. 2 (4 Cir.1983), we noted:
 Parratt does not impinge upon the right to a Sec. 1983 remedy for an officially inflicted injury done pursuant to an established procedure, which remains a violation of the requirement of procedural due process. Logan v. Zimmerman Brush Co., 455 U.S. 422, 434-437, 102 S.Ct. 1148, 1157-58, 71 L.Ed.2d 265 (1982)[.]
 See also Brewer v. Blackwell, 692 F.2d 387, 294-95 (5 Cir.1982); compare Evans v. City of Chicago, 689 F.2d 1286, 1298-99 and n. 15 (7 Cir.1982), with Flower Cab Co. v. Petitte, 685 F.2d 192 (7 Cir.1982) (administrative official's unilateral refusal to perform ministerial act may fall within Parratt ); cf. Rutherford v. U.S., 702 F.2d 580, 583 (5 Cir.1983).
 
 
 [18]
 As already discussed, supra, at n. 8, the brief period between the time the trial court's order went into effect and the Writ of Supersedeas displaced the order cannot be construed as a constructive issuance of the permit to Scott. Even if we were to conclude to the contrary, the taking complained of nevertheless also covers the period prior to the trial court's order, during which time Scott claims to have been deprived of a permit which should have issued earlier
 
 
 [19]
 Logan v. Zimmerman Brush, supra, 455 U.S. at 429, 102 S.Ct. at 1154 (cause of action a "species of property")
 
 
 [20]
 Put another way, a taking claim seeks to recover "just compensation" for inverse condemnation by the government. While real property and other tangibles are commonly subject to "purchase" by the state as a means of compensation, other forms of property interests--though constitutionally protected--are not normally so conceived. Scott's entitlement to a permit is of this latter variety. Cf. Maher v. City of New Orleans, 516 F.2d 1051, 1065 (5 Cir.1975), cert. denied, 426 U.S. 905, 96 S.Ct. 2225, 48 L.Ed.2d 830 (1976)
 
 
 [21]
 As still a third alternative, the district court reasoned that the County derived immunity from the legislative immunity claimed by the individual Council members. This unfounded notion was rejected in Bruce v. Riddle, 464 F.Supp. 745, 749 (D.S.C.1979), aff'd, 631 F.2d 272 (4 Cir.1980), in a suit against this same Greenville County and its Council
 
 
 [22]
 The state court opinion speaks in terms of the Council's involvement in the "administrative" permit issuance process, 257 S.E.2d at 720-21, and concludes that there was " 'no legal basis for the intrusion by the County Council into the zoning certificate and building permit process.' " Id. at 722 (emphasis added)
 
 
 [23]
 See also supra note 15
 
 
 [24]
 The district court did not consider qualified immunity, and the parties have not fully briefed the ramifications of Harlow for this case, so we leave initial resolution of the issue to the district court on remand. We will note, however, that there is little doubt that the constitutional prohibition against racially discriminatory application of zoning and permit issuance laws was "clearly established" at the time in question here. See Harlow, supra, --- U.S. at ----, 102 S.Ct. at 2738, 73 L.Ed.2d at 410
 
 
 [25]
 Adickes v. Kress & Co., 398 U.S. 144, 176, 90 S.Ct. 1598, 1618, 26 L.Ed.2d 142 (1970) (Black, J., concurring); see also Fisher v. Shamburg, 624 F.2d 156, 162 (10 Cir.1980)
 
 
 [26]
 It appears that in this type of development the gain to Scott as developer comes from his merely organizing and building the housing, rather than owning and managing it in the future. Calculation of his economic injury therefore does not depend upon any long-term projections of occupancy or the certainty of rent collection