935 F.2d 267
Unpublished Disposition
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
JOHN HANCOCK MUTUAL LIFE INSURANCE COMPANY, a corporation,
Plaintiff-Appellant,
v.
John Paul ANDERSON, Defendant-Appellee,
and
Robert L. Chipley, Jr., Edward K. Pritchard, deRosset Myers,
William McG. Morrison d/b/a Pritchard, Myers and
Morrison, Attorneys at Law, Defendants.
 No. 90-1749.
 United States Court of Appeals, Fourth Circuit.
 Argued March 5, 1991.
Decided June 12, 1991.
As Amended July 15, 1991.
 
 Appeal from the United States District Court for the District of South Carolina, at Charleston. Solomon Blatt, Jr., Senior District Judge. (CA-66-842-2-8)
 Thomas S. Tisdale, Jr., Young, Clement, Rivers & Tisdale, Charleston, S.C. (Argued), for appellant; Timothy W. Bouch, Stephen P. Groves, Young, Clement, Rivers & Tisdale, Charleston, S.C., on brief.
 William Smith Coleman, Jr., Cooper, Beard & Dibble, Betty M. Sloan, Columbia, S.C. (Argued), for appellee; T. Alexander Beard, Cooper, Beard & Dibble, Columbia, S.C., J. Lawrence Duffy, Morrison & Duffy, P.A., Charleston, S.C., on brief.
 D.S.C.
 REVERSED.
 Before SPROUSE, Circuit Judge, JAMES C. HILL, Senior Circuit Judge of the United States Court of Appeals for the Eleventh Circuit, sitting by designation, and HIRAM H. WARD, Senior United States District Judge for the Middle District of North Carolina, sitting by designation.
 PER CURIAM:
 
 
 1
 The appellant, an insurer, appeals the district court's conclusion that it violated the appellee's rights under 42 U.S.C. Sec. 1983. The district court determined that the appellant, in combination with certain state officials, conspired to deprive the appellee of his constitutional rights to a fair and impartial trial by suppressing pertinent evidence. We reverse.
 
 FACTS
 Criminal Proceedings:
 
 2
 In December, 1965, a jury in the Court of General Sessions for the County of Charleston, South Carolina convicted the appellee, John Paull (sic) Anderson, of murdering his wife, Brenda Lee Minton, by holding her under water until she drowned. The State's theory at trial was that Anderson had selected a young woman as his victim, insured her life for a substantial sum, (originally listing her parents as beneficiaries), married her, redesignated himself as the beneficiary, and then murdered her in the hope of collecting the proceeds.
 
 
 3
 After his conviction, Anderson filed a petition in the District Court for the District of South Carolina for federal habeas corpus relief. That court concluded that the State had not provided Anderson's defense counsel with available exculpatory evidence central to his defense, as required by the Supreme Court in Brady v. Maryland, 373 U.S. 83 (1963). On appeal, however, the Fourth Circuit vacated the relief the district court had granted Anderson under his Brady claim, holding that Anderson had failed to exhaust his state remedies. Anderson therefore applied for postconviction relief in state court, but eventually renewed his pursuit of federal habeas relief in the district court. The district court granted the writ, should the State of South Carolina not avail itself of the right to retry him. This Court of Appeals affirmed. The State chose not to retry Anderson because he had already served the statutory time for his crime and had been released on parole for several years.
 
 Civil Proceedings:
 
 4
 In December, 1966, John Hancock initiated a declaratory judgment action against Anderson and others regarding the life insurance policy issued upon the life of Anderson's wife. John Hancock contended that it would not have issued the policy had it been aware of the fraudulent answers contained within the policy. John Hancock also indicated that if Minton's allegedly fraudulent answers did not void the policy, then as an insurer it would remain subject to claims on the one hand from her husband/beneficiary/murderer, and on the other from Minton's parents, the original beneficiaries. John Hancock instituted the action, therefore, in order to determine whether and to whom it should pay the proceeds of this policy.
 
 
 5
 In 1986 (twenty years later), a jury trial commenced, with a jury eventually determining that Anderson had murdered his wife. The jury declared the insurance policy void ab initio. By this point, however, Anderson had filed a counterclaim alleging, among other things, that John Hancock had conspired with certain state officials to deprive him of relevant exculpatory material. The jury agreed that John Hancock, in combination with certain state officials (including the Solicitor's office for the Ninth Judicial Circuit), had conspired to deprive Anderson of his constitutional right to a fair and impartial trial in violation of 42 U.S.C. Sec. 1983, by suppressing evidence favorable to Anderson. The jury awarded Anderson both nominal and punitive damages.
 
 
 6
 In August, 1986, John Hancock moved for relief from the judgment based on newly discovered evidence, alleging that government experts had not prepared certain critical pages of an autopsy report (the Brady material), until December 15, 1965, the eve of trial. Thus, John Hancock claimed, the Solicitor could not have suppressed them.
 
 
 7
 In February, 1985, the district court granted John Hancock's Motion for a New Trial. In October, 1989, however, Anderson asked the district court to reconsider its grant of a new trial, citing uncovered testimonial evidence from a 1973 habeas corpus proceeding that tended to show that the complete autopsy report existed as of September 23, 1965. After a hearing in February, 1990, the district court granted Anderson's Motion to Reconsider and reinstated the jury verdict against John Hancock.
 
 
 8
 This appeal followed.
 
 DISCUSSION
 
 9
 John Hancock now contends that Anderson failed to produce substantial evidence to support his claim, and that the district court should have directed a verdict in John Hancock's favor. John Hancock also contends that the district court improperly reversed its grant of a new trial.
 
 Anderson's Sec. 1983 Claim:
 
 10
 We begin with John Hancock's first contention, for our resolution of that issue will control our determination of the other. As we have noted, Anderson premised his Sec. 1983 claim upon an alleged conspiracy among the Solicitor's Office for the Ninth Judicial Circuit ("Solicitor"), local law enforcement agents ("police"), and John Hancock, to suppress certain police records and a four-page autopsy report.
 
 
 11
 As Anderson correctly notes, litigants may bring actions pursuant to 42 U.S.C. Sec. 1983 to redress constitutional violations which transpired under color of state law. Dennis v. Sparks, 449 U.S. 24, 27 (1980); Adickes v. S.H. Kress & Co., 398 U.S. 144, 152 (1970). As Anderson also notes, we have held that "private persons who willfully participate in joint action with a state official act under color of law within the meaning of Sec. 1983, notwithstanding the official's immunity from civil liability." Scott v. Greenville County, 716 F.2d 1409, 1422 (4th Cir.1983) (citation omitted).
 
 
 12
 As plaintiff, Anderson had the burden of proof to demonstrate an act of conspiracy by John Hancock. Clark v. Mann, 562 F.2d 1104, 1117 (8th Cir.1978). As several circuits have noted, "[t]o prove a conspiracy between the state and private parties under Section 1983, the [plaintiffs] must show 'an agreement or "meeting of the minds" to violate constitutional rights.' " United Steelworkers of America v. Phelps Dodge, 865 F.2d 1539, 1541 (9th Cir.), cert. denied, 110 S.Ct. 51 (1989) (citations omitted).
 
 
 13
 In the instant case, we have searched the record in vain for any evidence that John Hancock conspired with state officials to deprive Anderson of his rights. In our view, Anderson's evidence shows at most that John Hancock merely acquiesced in, and did not interfere with, the police investigation of Mrs. Anderson's death.
 
 
 14
 As the appellant notes, Arthur Howe, the then Solicitor, testified that there was no agreement between his office and John Hancock regarding the treatment of Anderson. Howe's then assistant, Robert Wallace, testified to the same position. John Hancock's chief investigator, Kenneth Wilson, similarly indicated that he had never entered an agreement with either the Solicitor or with Frank West, the chief criminal investigator, to ensure Anderson's conviction. (Wilson, in fact, testified that, in his opinion, even if a court convicted Anderson for his wife's murder, the company would remain liable under the policy to the original beneficiaries, Mrs. Anderson's parents.) Law enforcement agents, moreover, including the Solicitor, testified that they never shared with John Hancock any information regarding Anderson or his access to exculpatory material.
 
 
 15
 In our view, Anderson's argument chiefly amounts to an assertion that John Hancock cooperated freely with police. Whereas Anderson perceives this cooperation as sinister, an emblem of "the conspiratorial web whose object was to keep the autopsy report from Anderson," we would view an insurer's cooperation with police as a natural expression of a citizen's civic duty. Anderson emphasizes that Wallace, the deputy prosecutor, testified that it would have been "general policy" to ask John Hancock to refrain from sharing any information it received from the police. John Hancock's compliance with police instructions, however, does not render it a conspirator. As the Ninth Circuit has noted in a similar context:
 
 
 16
 [M]ere acquiescence ... to [an] investigation request ... is, without more, insufficient to prove a conspiracy. While it is not necessary to prove that each participant in a conspiracy knew the exact parameters of a plan, they must at least share the general conspiratorial objective.
 
 
 17
 Fonda v. Gray, 707 F.2d 435, 438 (9th Cir.1983) (citation omitted) (emphasis supplied).
 
 
 18
 Anderson's case consists of conclusory allegations that since John Hancock cooperated with police, John Hancock by definition must have conspired with police to deprive Anderson of his right to a fair and impartial trial. As one court has defined the issue, the "test of whether a joint participation or conspiracy exists is whether the facts alleged demonstrate that the private individual and the public official acted with a common understanding or 'meeting of the mind' to deprive the plaintiff of his constitutionally protected rights." Augenti v. Capellini, 84 F.R.D. 73, 77 (M.D.Pa.1979). Here, however, Anderson produced no evidence that John Hancock devised any plan in conjunction with law enforcement agents to deprive Anderson of his rights.[1]
 
 
 19
 We review de novo a district court's treatment of a motion for a directed verdict. Gairola v. Virginia Dep't of General Services, 753 F.2d 1281, 1285 (4th Cir.1985). A court should direct a verdict "where there is 'no substantial evidence to support' the verdict asked of the jury." Business Development Corp. v. United States, 428 F.2d 451, 453 (4th Cir.1970), cert. denied, 400 U.S. 957 (1970) (citation omitted).
 
 
 20
 In the instant case, we have carefully scrutinized the record, not merely for substantial evidence, but for any evidence, to support Anderson's contention that John Hancock conspired with others to prejudice his rights. The record reflects no evidence beyond Anderson's "conclusory allegations." Goldschmidt v. Patchett, 686 F.2d 582, 585 (7th Cir.1982). We hold, therefore, that Anderson failed to produce sufficient evidence to support the verdict he requested from the jury; the district court, therefore, should have directed a verdict in favor of John Hancock.
 
 CONCLUSION
 
 21
 Because of our resolution of this issue, we need not address John Hancock's other contentions. We therefore reverse the judgment of the district court.
 
 
 22
 REVERSED.
 
 
 
 [1]
 The district court, in fact, noted the absence of a mutual agreement among John Hancock, the Solicitor, and police:
 There is no evidence that [John Hancock] knew Anderson didn't have [the Autopsy Report], there is no evidence that [John Hancock] knew that the Solicitor had told--told West not to give it. Those are two things [John Hancock] didn't know. So, only thing [John Hancock] did know is that [John Hancock] had [the Autopsy Report], [John Hancock] watched what was going on, and [John Hancock] had a common purpose.
 In our view, "a common purpose," at least as the district court uses the phrase, merely suggests John Hancock's satisfaction in learning that the Solicitor's goals (supposedly) mirrored its own. The case law, however, requires more than a common purpose; it requires a common understanding--some evidence, that is, of a mutual agreement. We have searched the record in vain for any evidence that John Hancock conspired with the Solicitor or with the police to suppress information.