THE PEOPLE *ex rel.* J. C. PENNEY PROPERTIES, INC., Plaintiffs-Appellees,
*v.* THE VILLAGE OF OAK LAWN *et al.*, Defendants-Appellants.

First District (3rd Division)   No. 62217

Opinion filed May 20, 1976.

Kozlowski & Smith, of Chicago, for appellants.

Nicholas D. Chabraja and Peter A. Flynn, both of Jenner & Block, of Chicago, for appellees.

Mr. JUSTICE DEMPSEY delivered the opinion of the court:

The plaintiff, J. C. Penney Properties, Inc., owned 24 acres of land at 111th Street and Cicero Avenue in the Village of Oak Lawn. It desired to sell a part of the property and petitioned the Village Board of Trustees to subdivide its acreage into three lots. The board refused and Penney brought this mandamus action. The trial court granted the writ and the Village appeals.

The events leading up to this appeal were these: In June 1973 Penney informally asked the board whether it would approve a three-parcel resubdivision of the land it owned in Oak Lawn. A resolution

unanimously adopted by the trustees who were present placed the board on record as favoring the proposed subdivision if Penney made a proper application through normal channels.

Penney followed the board's direction and presented its formal application to the Oak Lawn Planning and Development Commission which is empowered by the Village to hold hearings on proposed plats of subdivision and to make recommendations to the board concerning commercial site developments. On November 4, 1973, the commission recommended that the board deny Penney's application. This decision was appealed by Penney, and on November 27 it told the Board of Trustees that it planned to retain the largest lot (some 19 acres) for the construction of a department store; that it would sell the second lot (approximately 2½ acres) for the construction of a bank and that it would retain the third lot (about 2½ acres) as it had no plans for it at that time. The board postponed its decision until its December 11 meeting at which time it overruled the commission and approved a two-lot subdivision with one lot to be used by Penney and the other by a bank. Before the vote was taken, Penney had advised the board that plans were in the making for the third lot; that although no final agreement had been reached, Montgomery Ward & Co. had expressed interest in building two small, sit-down restaurants on this lot. One trustee suggested that Penney find some other kind of business for the third lot. A second stated that there was a moratorium on restaurants and that the board was opposed to more restaurants in Oak Lawn. The "moratorium" referred to by the trustee was a motion passed by the board in 1970 or early 1971, expressing the sense of the board that no new restaurants should be allowed in the Village.

About three months later Penney went before the Planning and Development Commission and advised its members that it had determined to sell the third lot to a Montgomery Ward subsidiary. It asked relief from the moratorium, which it said was an invalid prohibition, and asked approval of a three-parcel subdivision, the third part of which would be used for the construction of two family-type, limited menu restaurants, with no alcoholic liquors or carry-out facilities, and with parking provisions exceeding zoning requirements. Several commissioners expressed their opposition to lifting the moratorium. One remarked that Oak Lawn was becoming a village of restaurants and others questioned the competitive effect of new restaurants upon those already in the area. A motion was made to deny Penney's application on the basis that it would result in damage to the economic welfare of existing businesses. The motion carried.

Penney appealed the commission's decision. It told the board on April 23, 1974, that its property was zoned C-3 which not only permitted

restaurants but drive-in restaurants as well, and that while the legality of the moratorium was open to challenge, it was only seeking to have it modified. It presented photos and layouts of the proposed restaurants and testimony concerning market, population and economic factors—studies tending to show the likely success of the project. Trustees voiced objections to the proposal; one asked if Penney was not aware that the Village had a moratorium against restaurants; a second stated that stores not restaurants should be built on the property; a third said that the problem was the two additional restaurants. The president of the board explained that Penney was not asking for a change in zoning, but only for the right it already had in a C-3 district to obtain building permits for the construction of two buildings. Consideration of the proposal was put over until the meeting of May 14, 1974.

At the May meeting Penney pressed its request. It said its plans complied with the Village zoning ordinances and requested approval of the three-part resubdivision. One trustee said he would be in favor of three lots, but not in favor of two restaurants; another said that Penney knew the board did not want restaurants on that site. Two votes were taken. In the first, Penney's application for construction of two restaurants was denied. The Penney representative said he interpreted the vote as an instruction to the Village's building department to deny Penney building permits if it applied for them. The Village attorney replied that this was a reasonable interpretation; that Oak Lawn had a moratorium against restaurants and the board's vote was a denial of Penney's request to build restaurants. A motion was then made and seconded that Penney's request for the division of the property into three lots be denied. In the discussion that followed one trustee said the board would favor the subdivision when it was informed of the type of business that would be built on the property. A second trustee said it was not the intent of the board to deny the subdivision if some other type of construction were substituted. Six trustees, besides the president, were present at the meeting and the six voted to reject Penney's request.

We have related the comments made by the trustees and commissioners to show the exact reason why Penney's requests were denied. They were denied only because they ran counter to the board's moratorium on restaurants.

■■ The so-called moratorium had no legal standing; as the trial court correctly found, it was "informal, unwritten and selectively applied." The moratorium concept had never been adopted as an ordinance, or incorporated in an amendment to the Village's zoning ordinance. There had been no compliance with the notice and public hearing requirements of the Illinois Municipal Code (Ill. Rev. Stat. 1973, ch. 24, par. 11—13—14) or with the requirements of its own zoning ordinance (section 23—6)

which provide that proposed amendments must be submitted in writing and that the Planning and Development Commission must give notice and hold public hearings. A municipality must follow its zoning ordinances. The understanding among the trustees limiting the number of restaurants in Oak Lawn may have served as a deterrent to some would-be applicants, but it gave the board no power to refuse Penney's request to build two restaurants in a three-parcel resubdivision. The defendants argue that article VII, section 6(a) of the Illinois Constitution of 1970 and section 11—20—2 of the Illinois Municipal Code conferred upon Oak Lawn the power to prohibit the building of new restaurants within its boundaries whenever its corporate authorities felt that the operation of these restaurants would be inimical to the public welfare. Section 6(a) of article VII provides that a home rule unit may exercise any power and perform any function pertaining to its government and affairs except as limited by section 6. Section 11—20—2 of the Code (a section of division 20, Food, Water, Disease, Other Regulations) provides: "The corporate authorities may locate and regulate the places where and the manner in which any beverage or food for human consumption is sold * * *." Neither the constitutional provision nor the statutory one gives a municipality the right to regulate its affairs or to control its public eating places in the irregular manner attempted here. The corporate authorities of a municipality cannot change an established zoning ordinance by merely passing a motion to that effect. The only way a village or city may amend such an ordinance is by passing an ordinance in strict compliance with the procedure imposed by statute. *Phillips Petroleum Co. v. City of Park Ridge* (1958), 16 Ill. App. 2d 555, 149 N.E.2d 344.

■■ A municipality may refuse to grant a requested resubdivision if the applicant has failed to comply with the pertinent ordinances and statutes. *(Brown v. City of Joliet* (1969), 108 Ill. App. 2d 230, 247 N.E.2d 47; *People ex rel. American National Bank v. City of Park Ridge* (1960), 25 Ill. App. 2d 424, 166 N.E.2d 635.) Otherwise, its authorities must grant the application. They have no power to suspend, even temporarily, their own ordinances. Since there was no contention before the Board of Trustees that Penney's application was not in compliance with the Village ordinances or was not in proper form, the application should have been granted. When the applicable ordinances have been complied with, the act of approving a plat of resubdivision is a ministerial one and it may be enforced by mandamus. *Hoerrmann v. Wabash Ry. Co.* (1923), 309 Ill. 524, 141 N.E. 289; *People ex rel. Tilden v. Massieon* (1917), 279 Ill. 312, 116 N.E. 339; *People ex rel. First National Bank & Trust Co. v. Village of Deerfield* (1964), 50 Ill. App. 2d 349, 200 N.E.2d 120.

Although no objection was raised before either the Board of Trustees or the Planning and Development Commission that Penney's application did

not comply with the Village ordinances, such a contention was made in the trial court. For the first time, the argument was advanced that the application was improper because it requested permission to build two restaurants on one lot which, the defendants contended, was in contravention of section 6—5 of the Oak Lawn Zoning Ordinance:

> "Every building erected or structurally altered shall be located on a lot herein defined, and in no case shall there be more than one main building on one lot unless otherwise specified and provided in this ordinance."

If this point had been raised before either the board or the commission, Penney would have had an opportunity, if it thought the point was meritorious or even if it did not, of changing its application to request a resubdivision of four lots rather than three. Instead of selling a 2½-acre lot to Montgomery Ward for two restaurants, it could, we suppose, have arranged to sell a separate lot for each restaurant. The failure to raise the point at the hearing level deprived Penney of the option of either amending its application or of contesting the objection before the tribunals which could have decided it directly and immediately.

When confronted with the objection in the trial court, Penney responded by saying that section 6—5 of the ordinance pertained only to residential or ordinary lots rather than those within a C-3 zoning district. Section 3—44 of the zoning ordinance defines a lot as:

> "A parcel of land occupied or intended for occupancy by a use permitted in this ordinance, including one main building together with its accessory buildings, the open spaces and parking spaces required by this ordinance, and having its principal frontage upon a street."

Penney argued that the ordinance under which its property was classified (article XII, C-3 Regional Shopping District Regulations) provided that more than one building could be constructed on a lot. Section 12—1 of article XII states: "A regional shopping district is designed primarily to embrace comprehensive shopping centers where all phases of retail business operations are carried on as one unit or a series of units." C-3 regulations also provide for plural operations, e.g.: "drive-in restaurants" (section 12—2(c)); "structures" (section 12—2(k)); and "buildings" (section 12—4(a)). Penney argued that the ordinance, by using the plural in its various subsections, indicated that more than one building could be erected in areas zoned C-3, and that a C-3 area thus came within the "one main building on one lot" exception provided for in section 6—5: "unless otherwise specified and provided in this ordinance."

■■ The trial court accepted Penney's interpretation of the seemingly conflicting provisions in the ordinance, and specifically found that "Penney fully complied with the requirements of the Village of Oak

Lawn in presenting its application for the approval of the plat of resubdivision." We find no reason to disturb the court's ruling.

■■ Prior to granting the relief prayed for in Penney's complaint (a writ of mandamus directing the Board of Trustees to approve its application for a three-parcel resubdivision and to rescind the instruction to the Oak Lawn Building Commissioner to deny building permits for the two restaurants), the court suggested that Penney amend its complaint, which Penney did, to request a declaratory judgment invalidating the moratorium. The defendants contend that to permit Penney to request relief which was not prayed for in its original complaint "was beyond the scope and not within the purview of section 12, Amendment of Pleadings. (Ill. Rev. Stat., ch. 87)." Among other things, section 12 enables a plaintiff who has established facts which entitle him to relief that he has not sought to amend his pleading. We see nothing incompatible between this section and the amendment suggested by the court. A prayer for declaratory relief is permissible in a mandamus action. *Kitt v. City of Chicago* (1953), 415 Ill. 246, 112 N.E.2d 607; *Suburban Ready-Mix Corp. v. Village of Wheeling* (1962), 25 Ill. 2d 548, 185 N.E.2d 665.

The judgment is affirmed.

Affirmed.

MEJDA, P. J., and McGLOON, J., concur.