**FLOWER CAB COMPANY, Checker Taxi Company, Inc., and Yellow Cab Company, Plaintiffs,**

v.

**Karen PETITTE, Individually and as Commissioner, Department of Consumer Services of the City of Chicago, and the City of Chicago, Defendants.**

**No. 82 C 4538.**

United States District Court,
N.D. Illinois, E.D.

March 27, 1987.

publication.

Bernard J. Nussbaum, Harold C. Hirshman, Sonnenschein Carlin Nath & Rosenthal, Chicago, Ill., for plaintiffs.

Terence J. Moran, City of Chicago Corp. Counsel, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

NORDBERG, District Judge.

The plaintiffs instituted this action pursuant to 42 U.S.C. § 1983 to contest the Commissioner of the Department of Consumer Services of the City of Chicago's ("the Commissioner") unilateral imposition of a moratorium on the transfer of taxicab

licenses.[1] Plaintiffs Checker Cab Co. ("Checker") and Yellow Cab Co. ("Yellow") have filed a motion for summary judgment with respect to Count I of their three-count amended complaint. Count I alleges that the imposition of this moratorium violated plaintiffs' due process and equal protection rights guaranteed by the Fourteenth Amendment to the United States Constitution. For the following reasons, the court grants plaintiffs' motion for summary judgment with respect to Count I, and finds that plaintiffs are entitled to damages for the deprivation of their Fourteenth Amendment rights.

### Factual and Procedural Background

The underlying facts of this case are undisputed. Checker is one of the largest taxicab operators in the City of Chicago. At the time of the events in question, it owned 1,500 of the City's 4,600 taxicab licenses. In mid–1981, it decided to assign some of its licenses pursuant to the existing procedure set forth in chapter 28 § 28–9.1 of the Municipal Code of the City of Chicago. Checker notified the City of its plan to assign a minimum of three hundred licenses in July of 1981, and frequently conferred with City officials over the next six months to discuss the assignments (Feldman Aff. Ex. A). On February 10, 1982, Karen Petitte, the Commissioner, wrote to Checker indicating approval of the contemplated assignment (Feldman Aff. Ex. B). Between March and June of 1982, Checker attended several meetings with City officials. At no time did the City give any indication that it would seek to prevent or prohibit the contemplated assignments. On July 9, 1982, Checker representatives met with then Mayor Jane Byrne, the Commissioner, and members of the City's Corporation Counsel, none of whom mentioned any disapproval of the assignments or pos-

sible impediments to the proposed transfers (Feldman Aff. ¶¶ 5–9).

On July 13, 1982, Checker contracted to assign thirteen taxicab licenses to Flower Cab Co. ("Flower"). Flower filed applications for processing the assignments with the Commissioner two days later. The Municipal Code of the City of Chicago, chapter 28, § 28–9.1 permitted assignment of these licenses if the assignee met certain standard qualifications. These applications generally required two to five days to process. The routine nature of the processing of assignments is evidenced by the fact that, in the three years prior to Flower's application, the City had processed every application for assignment filed with the Commissioner.[2]

An ordinance prohibiting the sale, transfer or assignment of any taxicab licenses was introduced in the City Council on the same day that Flower filed its applications with the Commissioner. On July 16, 1982, the Commissioner announced a moratorium on the processing of all applications for assignment and refused to consider Flower's applications because of the pendency of the ordinance. As a result, Flower and Checker filed this action pursuant to § 1983 for injunctive relief.

This court issued a preliminary injunction on July 26, 1982, ordering the Commissioner to process Flower's applications by August 6, 1982, in the ordinary course of its established procedure, thereby returning the parties to the status quo prior to the moratorium. The Seventh Circuit granted the City's motion for a stay pending appeal, *Flower Cab Co. v. Petitte*, 685 F.2d 192 (7th Cir.1982), and denied plaintiffs' subsequent motion to vacate and rehear *en banc Flower Cab Co. v. Petitte*, No. 82–2208 (7th Cir. Aug. 20, 1982) (unpublished order).

On September 14, 1982, the City Council conducted a hearing on the proposed ordi-

---

1. The plaintiffs have sued the Commissioner and the City itself. The City apparently concedes that the Commissioner's moratorium exposes it to potential liability under *Monell v. Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2098, 56 L.Ed.2d 611 (1978) and *Pembaur v. City of Cincinnati*, 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986).

2. The record does not contain any data regarding the number of transfers or their approval record prior to 1979. However, both parties agree that these transfers had been routinely granted throughout the history of the licensing ordinance; and had rarely, if ever, been denied by the Commissioner.

nance. Plaintiffs were afforded the opportunity to participate in the hearing. At the hearing, the Commissioner testified that the new ordinance was drafted "in response to a plan by one of the cab companies [Checker] to sell its medallions[3] at prices of up to $15,000 per medallion, a matter which was viewed by at least some as windfall profits for the cab companies." (Transcript of September 14, 1982 Hearings Before the Committee on Local Transportation, at 7).[4] The City Council passed the proposed ordinance on September 15, 1982. The ordinance contained several amendments to the taxicab licensing procedure; the most significant changes for the purposes of this lawsuit are the repeal of chap. 28 § 28–9.1 and the creation of a new provision retroactively banning all transfers of licenses as of July 15, 1982, the date of the moratorium.

The Seventh Circuit vacated this court's July 26, 1986 preliminary injunction in an unpublished order on October 7, 1982. *Flower Cab v. Petitte*, 692 F.2d 760 (7th Cir.1982). Noting the change in circumstances created by the passage of the September 15 amendments, the court remanded the action to this court to consider the validity of the new ordinance and its effect on this litigation. On remand, the plaintiffs filed an amended complaint attacking the validity of the ordinance, and the court granted plaintiffs' motion to add Yellow Cab Co. as a party plaintiff.[5]

The plaintiffs then renewed their motion for a preliminary injunction, and the defendants filed a motion to dismiss the amended complaint. The court denied both motions in a memorandum opinion and order entered June 17, 1983. With respect to the motion to dismiss, the court held that Count I of the amended complaint adequately stated a cause of action under § 1983 and that the ordinance did not moot the amended complaint. *See Flower Cab Co. v. Petitte*, No. 82 C 4538, slip op. at 3–9 (N.D.Ill. June 17, 1983).[6] The court also denied plaintiffs' motion for a preliminary injunction, finding that the plaintiffs had failed to establish that they had no adequate remedy at law and they would be irreparably harmed if an injunction did not issue. *Id.* at 12–14.

### Motion For Summary Judgment

The motion for summary judgment filed by Yellow and Checker addresses only Count I of the amended complaint. This count alleges that the Commissioner's July 16, 1982 moratorium violates plaintiffs' rights to due process and equal protection and deprives plaintiffs of a valuable property right without due process of law. Yellow[7] and Checker have filed affidavits and

---

3. The City's 4600 licenses are represented by an equal number of metal medallions, which are affixed to the hood of every properly licensed vehicle. Assignment of a license requires the transfer of the medallion to the assignee. *See* Municipal Code of City of Chicago, chap. 28 §§ 28.1(f), 28–10.1 (1982).

4. In 1982, every owner of the City's 4600 licenses paid an annual fee of $200 to renew his license(s). Barring unusual circumstances, the license holders were automatically entitled to a renewal of their licenses every year. Chap. 28, § 28–22.1(a)–(b). Assignment of a license also transferred the right to renewal of the license to the licensee. Several cab companies had capitalized on the lucrative sales of these assignments before Yellow. Prior to the sales attempted by Yellow in 1982, the market rate for these assignments ranged from $25,000 to $27,-000 (Dep. of Arthur Dickholtz at 39). Dickholtz testified that in the five years prior to 1982 he had assisted several small cab companies in their efforts to obtain license assignments. The prevailing rate for these transfers ranged from $22,000 to $29,000, without the vehicle (*Id.*).

5. The amended complaint challenges the constitutionality of the moratorium (Count I); the September 15, 1982 ordinance (Count II); and the Commissioner's inspection procedure in the fall of 1982 (Count III). The present motion addresses only the issues raised by Count I of the amended complaint.

6. The court also denied the motion to dismiss Count II, which alleges that the September 15, 1982 ordinance caused an unconstitutional impairment of contract. *Flower Cab, supra,* slip op. at 9–12.

7. The present motion has been brought on behalf of Checker and Yellow only. The materials submitted do not indicate why Flower was not joined in the motion for summary judgment. Checker has submitted evidence of over 500 assignments which were thwarted by the imposition of this moratorium. *See* Feldman Aff. ¶ 11, Ex. D. In contrast, the court notes that Yellow has not submitted any documentation regarding its alleged injuries caused by the moratorium.

other evidentiary materials in support of their motion. They seek a declaratory judgment and injunctive relief, or, in the alternative, damages for the monetary losses caused by the alleged unconstitutional imposition of this moratorium.

The standards for granting a motion for summary judgment are well-established in this circuit. On a motion for summary judgment, the moving party has the burden of establishing that there is no genuine issue of material fact, and that it is entitled to judgment as a matter of law. *Cedillo v. International Ass'n of Bridge & Structural Iron Workers*, 603 F.2d 7, 19 (7th Cir.1979). The nonmoving party is entitled to all reasonable inferences that can be made in its favor. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962). However, the defendant may not merely rely on conclusory pleadings to withstand summary judgment. In responding to a motion for summary judgment, he must set forth specific facts in affidavits or otherwise showing that there are genuine issues that must be decided at trial. *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968); *Posey v. Skyline Corp.*, 702 F.2d 102, 105 (7th Cir.), *cert. denied*, 464 U.S. 960, 104 S.Ct. 392, 78 L.Ed.2d 336 (1983).

The purpose of the summary judgment procedure is to eliminate trial in cases where a trial is unnecessary and only results in delay and expense. *Mintz v. Mathers Fund, Inc.*, 463 F.2d 495, 498 (7th Cir. 1972). As the Seventh Circuit has noted, with the ever-increasing burden on the judiciary, persuasive reasons exist for the utilization of summary judgment procedures whenever possible. *Kirk v. Home Indem-*

*nity Co.*, 431 F.2d 554, 559–60 (7th Cir. 1970). Courts therefore will not strain to find the existence of a genuine issue where none exists. *Id.*

## 42 U.S.C. § 1983

In order to establish a violation of Section 1983, plaintiffs must prove that defendants acted under color of state law, and that their conduct deprived plaintiffs of a right, privilege or immunity secured by the Constitution of the United States. *Parratt v. Taylor*, 451 U.S. 527, 535, 101 S.Ct. 1908, 1913, 68 L.Ed.2d 420 (1981). In the present case, the defendants concede that the Commissioner's moratorium prohibiting transfer of taxicab licenses constitutes state action. They argue, however, that the plaintiffs have failed to establish that this moratorium deprived them of any rights protected by the Constitution.[8]

According to plaintiffs, chap. 28 § 28–9.1 of the Municipal Code creates a substantive right to assign taxicab licenses, and the Commissioner's unilateral imposition of a moratorium on transfer of these licenses deprives them of this property right without due process of law. The City disputes plaintiffs' characterization of the license and its assignability as "property rights" protected by the Fourteenth Amendment. In *Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), the Supreme Court articulated the appropriate analysis to determine whether an alleged "property" right was protected by the Constitution. It held that, "[property rights] are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that secure benefits and that support claims of entitlement to those benefits." *Id.* at 577, 92 S.Ct. at 2709. The

---

**8.** In its opinion granting the stay, the Seventh Circuit expressed some doubts regarding the viability of plaintiffs' claim under § 1983. *Flower Cab Co. v. Petitte*, 685 F.2d 192 (7th Cir.1982). However, the Court noted in its October 7 ruling vacating the preliminary injunction that "all of our legal and evidentiary observations 'in our opinions are tentative, based as they are on the very incomplete record before us and the short time that we had to act on the motion [for a stay].'" 685 F.2d at 194. The district court should consider himself free to

reexamine the views expressed in those opinions in light of any additional evidence as well as the passage of the ordinance." *Flower Cab Co. v. Petitte*, 692 F.2d 760 (1982). As this court explained in its June 17, 1983 memorandum opinion, subsequent decisions of the Supreme Court and the Seventh Circuit have established that plaintiffs' allegations in Count I of their amended complaint are sufficient to state a claim under § 1983. *See Flower Cab, supra,* slip op. at 7–8, n. 9 [692 F.2d 760 (Table) ].

Court emphasized that, "[t]o have a property interest in a benefit, a person clearly must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Id.*

The Illinois General Assembly has authorized the City of Chicago to license, tax and regulate taxicab operators. Ill.Rev.Stat. ch. 24, § 11–42–6. Pursuant to this authority, the City promulgated a comprehensive scheme for the licensing of taxicab operators in 1963. The ordinance provides for the creation of 4600 taxicab licenses which are subject to a $200 annual licensing fee. It limits the circumstances in which a license can be suspended or revoked,[9] and provides that all licenses which have not been revoked, cancelled or surrendered are entitled to renewal upon their expiration at the end of each calendar year. § 28–22.-1(b). In addition, and most important for the purposes of this case, the ordinance expressly authorizes the assignment of these licenses. § 28–9.1.

■ According to the City, the fact that Illinois law characterizes a license as a personal privilege precludes a finding that these taxicab licenses are protectable property interests. In *Reed v. Village of Shorewood,* 704 F.2d 943 (7th Cir.1983), the Seventh Circuit considered and rejected a similar argument with respect to liquor licenses. The Village argued that the Illinois Liquor Control Act's characterization of liquor licenses as "purely personal privilege[s] ... [which] shall not constitute property" foreclosed a finding that the plaintiff had a protectable property interest in his liquor license. The court acknowledged that liquor licenses lack some of the conventional attributes of property (*e.g.,* they cannot be sold or bequeathed); however, it found that these limitations on ownership did not preclude the recognition of Reed's protectable interest in the license. The court held that the state's characterization did not control the issue of whether the license constituted property; rather, the court should determine whether the

license constituted property in a "functional" sense. *Reed,* 704 F.2d at 948. It explained:

> Since, viewed functionally, property is what is securely and durably yours under state law, as distinct from what you hold subject to so many conditions as to make your interest meager, transitory or uncertain, we must ask whether under Illinois law a liquor license is securely and durably the licensee's. The license is good for one year and during that time, clearly it is securely held, for it can be revoked only for cause, after notice and a hearing, and subject to judicial review.

*Id. See Philly's v. Byrne,* 732 F.2d 87 (7th Cir.1984) (reiterating *Reed*'s recognition of a property interest in liquor licenses). *See also Greco v. Guss,* 775 F.2d 161, 170 (7th Cir.1985).

Applying the *Reed* court's analysis to this case, the court finds that plaintiffs clearly possess a protectable property interest in the taxicab licenses. The ordinance provides that the license holder is the exclusive owner of the license, that he may assign it with few qualifications, and that he is entitled to renewal of the license absent revocation or suspension. These characteristics demonstrate that the taxicab licenses were "securely and durably" the licensee's. Accordingly, the court rejects the City's argument that these licenses are not "property" protected by the Fourteenth Amendment to the Constitution.

■ Plaintiffs also argue that the procedure for assignment of taxicab licenses set forth in chap. 28 § 28–9.1 of the Municipal Code also constitutes a valuable property interest which the City cannot arbitrarily eliminate. At the time plaintiffs sought to transfer their licenses, this ordinance provided:

> The licenses and the rights and privileges herein granted shall be assignable provided that before any such assignment

---

**9.** A license may be revoked for failure to affix a current medallion (§ 28–10.3); failure to provide proper insurance (§ 28–12); failure to appear in court after notice (§ 28–15); conviction of a felony or crime of moral turpitude (§ 28–15); or obtaining a license by fraud (§ 28–15.1). It may be suspended for failure to maintain a safe and sanitary vehicle (§ 28–14).

shall become effective the Commissioner shall find that the assignee is qualified to comply with the terms and conditions of this ordinance.... In determining whether a proposed assignee is qualified, the Commissioner shall take into consideration:

(a) The character and reputation of the assignee or its members or officers as law-abiding citizens;

(b) The financial ability of the assignee to render lawful, safe, suitable and comfortable service and to maintain or replace the equipment for such service;

(c) The financial responsibility of the assignee to maintain insurance for the payment or personal injury, death and property damage claims;

(d) The color scheme proposed for use to prevent deception or confusion as to the ownership of the taxicab employed and the identity of the person or persons responsible for the service.

If the assignee is found to be qualified the license shall be transferred to him by the Commissioner, subject to payment of a transfer fee of $50.00 and approval by the Commissioner of the insurance required by Sections 28–12 or 28–12.1.

These provisions clearly demonstrate the limited nature of the Commissioner's ability to reject a proposed transfer of a license. Absent facts indicating the presence of a disqualifying condition outlined in the ordinance, the Commissioner has no authority to reject a requested transfer of a taxicab license. In fact, prior to the moratorium, the Commissioner had never rejected an application for assignment during the twenty years that this ordinance was in effect.

This court recognized plaintiffs' due process right with respect to these transfers in its June 17, 1986 memorandum opinion and order:

Plaintiffs contend that the Commissioner's failure to process the applications of assignment constituted a violation of their substantive due process rights by depriving them of valuable property—the right to assign and be assigned taxicab licenses, pursuant to chap. 28 § 28–9.-1.... Plaintiffs' alleged entitlement to the assignments, as a matter of substantive due process, is supported by the Supreme Court's recent ruling in *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 102 S.Ct. 1148 [71 L.Ed.2d 265] (1982). There, the Court found that a discharged employee's right to use the Illinois Fair Employment Practices Act's adjudicatory procedures was a species of property protected by the Fourteenth Amendment's due process clause.

The property interest in *Logan* is comparable to [that advanced by plaintiffs]. Both stem from entitlements created by local governments and substantially relied upon by the claimants. Logan was denied a state statutory right to have the Illinois Fair Employment Practices Commission review the claim. The deprivation of this right was arbitrarily made and was final—Logan could not obtain judicial review of the commission's action.

In the instant action, the plaintiffs were denied assignments of taxicab licenses in the face of a city ordinance affirmatively granting them a right to such assignments. Both Flower and Checker relied on the then-effective city ordinance when the contracts of assignment were entered into on July 13, 1982. [They complied with] the qualifications set forth in the ordinance. Therefore, the Commissioner's processing of these applications should be viewed as ministerial. A taxicab license is clearly a valuable property right, and its assignability was an important aspect in the 'bundle of rights' that comprises the property in question.

*Flower Cab Co., supra*, slip op. at 4–6 [692 F.2d 760 (table)].[10]

---

**10.** The *Logan* court explained:

The hallmark of property, the Court has emphasized, is an individual entitlement grounded in state law, which cannot be removed, except 'for cause' (citations omitted). Once that characteristic is found, the types of interests protected as "property" are varied and, as often as not, intangible, relating to the whole

Although the City continues to dispute the accuracy of this court's recognition of a property interest in the assignment process, recent caselaw in this circuit and other circuits supports the conclusion that § 28–9.1 bestowed a property interest on the owners of taxicab licenses. In *Reed v. Village of Shorewood, supra,* the court held that plaintiff's property interest in his liquor license included a right to *renew* the license. *Reed,* 704 F.2d at 949. Therefore, a commissioner could not avoid the procedural requirements for revocation of a license simply by allowing a license to expire and then refusing to renew it. *Id.* Plaintiffs' property right in this assignment resembles the *Reed* plaintiff's right to the statutory system for renewing and revoking licenses. The Commissioner in this case could not unilaterally suspend the assignment procedure in order to avoid following the existing statutory framework for a license assignment without interfering with plaintiffs' right to assign these licenses.

The Second Circuit reached a similar conclusion in *Sullivan v. Town of Salem,* 805 F.2d 81 (2d Cir.1986). In *Sullivan,* the plaintiff filed a § 1983 action alleging that the Town's failure to accept dedicated roads and its failure to issue certificates of occupancy for completed houses violated his due process rights under the Fourteenth Amendment. The district court granted summary judgment for the town on both claims, finding that plaintiff had no property interest or legitimate claim of entitlement to the dedication or the certificates.

On appeal, the Second Circuit held that Sullivan had no property right to the dedication because the state statute provides that acceptance of a dedication is wholly discretionary. *Sullivan,* 805 F.2d at 84. The court held, however, that Sullivan did possess a legitimate claim of entitlement to the certificates of occupancy. The court acknowledged the difficulty of determining when a license application procedure cre-

ates a property interest in an applicant. It held:

> [T]he question of whether an applicant has a legitimate claim of entitlement to the issuance of a license or certificate should depend on whether, absent the alleged denial of due process, there is either a certainty or a very strong likelihood that the application would have been granted. Otherwise the application would amount to a mere unilateral expectancy not rising to the level of a property right guaranteed against deprivation by the Fourteenth Amendment. [quoting *Yale Auto Parts, Inc. v. Johnson,* 758 F.2d 54, 59 (2d Cir.1985)].
>
> By that standard we [do] not intend to remove from constitutional protection every application for a license or certificate that could, under any conceivable version of the facts, be the subject of discretionary action; a theoretical possibility of discretionary action does not automatically classify an application for a license or certificate as a mere 'unilateral hope or expectation.' On the contrary, our standard was intended to be a tool capable of measuring particular applications to determine if the applicant had a legitimate claim of entitlement based on the likelihood that without the due process violation that application would have been granted.

*Sullivan,* 805 F.2d at 85. The court noted that Connecticut law provided that, if the houses conformed to the standards of the building codes, then the Town could not refuse to issue the certificates. It remanded the case to the district court to determine whether the houses met these requirements and whether the sole reason for denying the certificates was unauthorized by state law. *Id.*

The Eighth Circuit employed similar reasoning in *Littlefield v. City of Afton,* 785 F.2d 596 (8th Cir.1986). In *Littlefield,* the plaintiffs alleged that the City's refusal to issue a building permit violated their rights

domain of social and economic fact.' (citations omitted). *Logan,* 455 U.S. at 430, 102 S.Ct. at 1155.

The limitations on the Commissioner's ability to reject the assignment of a license places the assignment procedure squarely within the standards articulated by the *Logan* court.

to substantive and procedural due process. The court noted that a legitimate claim of entitlement can arise from procedures established in statutes or regulations adopted by states or political subdivisions. *Littlefield,* 785 F.2d at 600. After analyzing the Minnesota statutes regulating the issuance of building permits, the court held that the fact that the issuer had little or no discretion to deny permit requests in conformity with the statutory prerequisites demonstrated that plaintiffs possessed a legitimate claim of entitlement to the permit. *Littlefield,* 785 F.2d at 601–02.

Similarly, in *Scott v. Greenville County,* 716 F.2d 1409, 1418 (4th Cir.1983), the Fourth Circuit held that the plaintiff had a protectable property interest in a permit "upon presentation of an application and plans showing a use expressly permitted under the then-current zoning ordinance." Relying on the state of the law at the time Scott's application was filed, the court held. that the fact that the County was reconsidering the zoning in the area in which Scott proposed to build did not divest Scott of his legitimate claim of entitlement to the building permit. *Id.* at 1418.[11]

The text of § 28–9.1 presents an equally strong case for the recognition of a property right in the assignment process. In this case, the City acknowledges that the Commissioner's refusal to process the applications for assignment was unrelated to the statutory requirements outlined in the ordinance. The Commissioner had no statutory authority to unilaterally reject applications for reasons other than those set forth in § 28–9.1. Given the mandatory language of the ordinance, plaintiffs clearly possessed a legitimate claim of entitlement to these transfers. This language, combined with the Commissioner's representations of approval of the proposed transfers,[12] and the historical fact that no transfer had ever been denied prior to the moratorium, easily refutes the City's argument

that plaintiffs possessed no property rights in this assignment process.

Moreover, plaintiffs possessed this property right to the transfers at the time they were filed. The fact that the City Council was reconsidering the propriety of § 28–9.1 (admittedly in response to plaintiffs' applications) did not operate to divest plaintiffs of this right. *See Scott v. Greenfield County,* 716 F.2d at 1418.

■ The City argues that, even if plaintiffs possessed a property interest in the licenses and their transferability under § 28–9.1, *Parratt v. Taylor,* 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), bars this court from addressing their due process claims. The court rejected this argument in its June 17, 1983 memorandum opinion and order:

> Despite defendants' arguments, the Supreme Court's decision in *Parratt v. Taylor, supra* is not to the contrary. There, a state employee negligently lost a prisoner's hobby kit. While the Court concluded that the prisoner had suffered a deprivation of property within the meaning of the Fourteenth Amendment, it held that all the process due was provided by the state's tort claims procedure. The defendants, in the instant action, argue that plaintiffs had a viable remedy in a state writ of mandamus action and should not look to federal court for relief.
>
> This argument misses *Parratt*'s point. In *Parratt,* the Court emphasized that it was dealing with "a tortious loss of property as a result of a random and unauthorized act by a state employee ... not a result of some established state procedure." 451 U.S. at 541, 101 S.Ct. at 1915. [I]n contrast, the Commissioner's refusal to process the license assignments [in this case] without a hearing is based upon the pendancy [sic] of a city ordinance which was ultimately enacted

---

11. *See also Shelton v. City of College Station,* 754 F.2d 1251, 1256–57 (5th Cir.1985); *Dirt, Inc. v. Mobile County Commission,* 739 F.2d 1562, 1566 (11th Cir.1984); *Parks v. Watson,* 716 F.2d 646, 656–657 (9th Cir.1983).

12. Checker notified the Commissioner of its proposed transfers over one year prior to the moratorium. She was kept abreast of the developments of these contracts throughout the following year. *See generally* Feldman Aff. and exhibits A–D attached thereto.

in retroactive form on September 15, 1982. *Parratt* does not deal with such a situation. Unlike the complainant in *Parratt,* here plaintiffs are not challenging the Commissioner's negligent error, but rather an "established city procedure" that destroyed their property entitlement without due process of law. *Flower Cab,* slip op. at 6–7 [692 F.2d 760 (Table)]. By its own terms, *Parratt* applies only where the " 'loss is not the result of some established state procedure and the State cannot predict precisely when the loss will occur ... [and] it is not only impracticable, but impossible to provide a meaningful hearing before the deprivation.' " *Littlefield v. City of Afton,* 785 F.2d 596, 600 (8th Cir.1986), citing *Parratt,* 451 U.S. at 541, 101 S.Ct. at 1916. In the present case, the plaintiffs claim that the City has systematically deprived them of their rights to transfer created by § 28–9.1 of the Municipal Code. The City acknowledges that the moratorium constituted official policy, and has not presented any factual materials to demonstrate the impossibility or impracticability of a hearing prior to its declaration. Accordingly, the court reiterates its prior conclusion that *Parratt* is inapplicable to the present case. *See Hudson v. Palmer,* 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984); *Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 435, 102 S.Ct. 1148, 1157, 71 L.Ed.2d 265 (1982); *Greco v. Guss,* 775 F.2d 161, 171 (7th Cir. 1985); *Evans v. City of Chicago,* 689 F.2d 1286, 1298 (7th Cir.1982). *See also Littlefield v. City of Afton,* 785 F.2d 596, 600 (8th Cir.1986); *Sullivan v. Town of Salem,* 805 F.2d 81, 86 (2d Cir.1986); *Augustine v. Doe,* 740 F.2d 322, 327–29 (5th Cir.1984).

Having concluded that plaintiffs possess a property interest in these licenses and their transferability, the court must now determine whether the Commissioner's unilateral imposition of a moratorium on the processing of all pending and prospective applications for assignment violated their rights to substantive and procedural due process.

### Substantive Due Process

An action under § 1983 alleging violation of substantive due process rights is limited to a determination of whether the municipality's administration of a local ordinance was arbitrary and capricious and thereby deprived plaintiffs of their property. *Barbian v. Panagis,* 694 F.2d 476, 480 (7th Cir.1982). "A particular decision or action is 'arbitrary' if it is reached 'without adequate determining principle or was unreasoned.' " *Scudder v. Town of Greendale, Ind.,* 704 F.2d 999, 1002 (7th Cir. 1983), citing *United States v. Carmack,* 329 U.S. 230, 243, 67 S.Ct. 252, 258, 91 L.Ed. 209 (1946). Applying this definition, it is clear that the Commissioner acted arbitrarily when she issued the July 16, 1982 moratorium. Neither state law nor the City's ordinances permitted her unusual and unprecedented action. As such, the moratorium was not a "reasoned application" of an "adequate determining principle." *Scudder, supra.* See also *Scott v. Greenville County,* 716 F.2d 1409, 1419–21 (4th Cir.1983).

The Illinois General Assembly empowered the City Council of Chicago to enact ordinances regulating the taxicab industry. *See* Ill.Rev.Stat. ch. 24, § 11–42–6. The City exercised this legislative power when it passed chapters 16 [13] and 28 of the Municipal Code. It did not bestow any similar powers on the Commissioner, an unelected official of the City.

In general, the power to enact an ordinance includes the power to amend it. *City of Litchfield v. Hart,* 306 Ill.App. 621, 624, 29 N.E.2d 678, 680 (1940); 8 *ILP:* Cities, Villages and Other Municipal Corporations, § 161. This power may only be exercised by the body with the power to enact the ordinance in the first place, *City of Litchfield, supra;* and an amendment must be enacted in the same fashion that the ordinance was originally enacted. *Naperville Police Union v. City of Naperville,* 97 Ill.App.3d 153, 156, 52 Ill.Dec. 660,

---

**13.** Chapter 16 of the Municipal Code defines the Commissioner's office and outlines her administrative duties and responsibilities.

664, 422 N.E.2d 869, 873 (1981); *DuMond v. City of Mattoon*, 60 Ill.App.2d 83, 89, 207 N.E.2d 320, 323 (1965); *City of Litchfield, supra.* Furthermore, an ordinance cannot be amended by resolution, but only by a duly enacted ordinance of the governing body of the municipality. *Naperville Police Union, supra; Johnson v. City of Elgin*, 31 Ill.App.3d 250, 255, 333 N.E.2d 287, 291 (1975); *Philips Petroleum Co. v. City of Park Ridge*, 16 Ill.App.2d 555, 149 N.E.2d 344, 347–48 (1958).

Illinois does not even permit the City Council to unilaterally impose a moratorium suspending an ordinance. In *Philips Petroleum, supra,* the City Council adopted a resolution suspending the issuance of business permits while the Council contemplated the passage of a new ordinance. The court held that the resolution was ineffective to change the existing ordinance and that the City Council had no authority to suspend the operation of the statute while it was considering an amendment. *Id.* at 563, 149 N.E.2d at 348–350. Similarly, in *People ex rel. J.C. Penney v. Village of Oak Lawn*, 38 Ill.App.3d 1016, 349 N.E.2d 637 (1976), the plaintiffs challenged the Village's rejection of a proposed subdivision on the grounds that the subdivision failed to comply with an existing village moratorium on restaurants. The court held that imposition of the moratorium was improper:

> A municipality may refuse to grant a requested subdivision if the applicant has failed to comply with the pertinent ordinances and statutes. . . . Otherwise, the authorities must grant the application. They have no power to suspend, even temporarily, their own ordinances. Since there [is] no contention . . . that [plaintiff's] application was not in compliance with the Village ordinances or was not in proper form, the application should have been granted.

38 Ill.App.3d at 1019, 349 N.E.2d at 640. *See also Gary-Wheaton Bank v. Village of Lombard*, 84 Ill.App.3d 125, 39 Ill.Dec. 524, 404 N.E.2d 1115 (1980); *Sgro v. Howarth*, 54 Ill.App.2d 1, 203 N.E.2d 173 (1964).

As the foregoing authorities make abundantly clear, even the City Council cannot unilaterally suspend the enforcement of one of its ordinances. It follows that the Commissioner, an administrative agent whose powers and functions derive from ordinances passed by the Council, possessed no legal authority to issue the moratorium announced in July of 1982. Reference to the statute outlining her duties establishes that the City Council has never authorized the Commissioner to take this sort of action. Chap. 16, § 16–4 of the Municipal Code defines the scope of the Commissioner's power and authority. It contains no reference to the unprecedented action taken in this case. In fact, its provisions place significant constraints on the Commissioner's ability to affect the existing terms of the taxicab ordinance and clearly establishes the impropriety of her conduct.

For instance, § 16–4–11 authorizes the Commissioner to make *recommendations*ᐟ . . . to the Mayor with respect to additions or revisions of the Municipal Code; and § 16–4.3 permits the adoption of rules and regulations "expedient for the proper administration and enforcement of th[e] Code" *after* proper notice and a hearing. Thus, the responsibility for revising and changing the code clearly lies with the Mayor and the City Council. Nothing in the City's ordinances authorized the Commissioner's unexpected and unprecedented imposition of this moratorium. This court implicitly recognized the invalidity of the Commissioner's action in its order granting the preliminary injunction. *See* Transcript of Proceedings, Friday, January 22, 1982 at 12–13, 15–16. Accordingly, the court finds that the Commissioner's imposition of this moratorium was arbitrary and had no basis in law. Therefore, the court concludes that the moratorium deprived plaintiffs of their substantive due process rights.

**Procedural Due Process**

■ Even if the Commissioner *were* authorized to impose a moratorium, which she clearly was not, her announcement of this moratorium should not have occurred prior to notice and a hearing regarding the valid-

ity or propriety of such action. It is undisputed that Commissioner Petitte unilaterally imposed this moratorium without any notice to the taxicab companies. "The essence of due process is notice and an opportunity to be heard," *David v. Lane*, 814 F.2d 397, 402 (7th Cir.1987). "Parties whose rights are to be affected are entitled to be heard...." *Fuentes v. Shevin*, 407 U.S. 67, 80, 92 S.Ct. 1983, 1994, 32 L.Ed.2d 556 (1971) (citation omitted). Due process does not require a full evidentiary hearing in every situation, *Meridian Homes Corp. v. Nicholas W. Prassas & Co.*, 683 F.2d 201, 204 (7th Cir.1982); the hearing must be appropriate to the nature of the case. *Gallagher & Ascher Co. v. Simon*, 687 F.2d 1067, 1076 (7th Cir.1982).

This is not a situation where the court must decide whether the plaintiffs should have been granted a pre- or post-deprivation hearing. *Compare Fuentes, supra.* In this case, the City determined that the plaintiffs were not entitled to *any* hearing with respect to the moratorium, despite the acknowledged effect that the moratorium had on the plaintiffs' existing right to transfer taxicab licenses. The court finds that this moratorium, entered without any legal authority or justification, failed to comport with the fundamental procedures required by due process.

The City did not provide a predeprivation hearing because it wanted to catch the cab companies "off guard." According to the City, a hearing on the moratorium would have destroyed the very purpose of imposing it—the prevention of a possible flood of transfer applications while the City Council was contemplating an amendment to the ordinance which would forbid these transfers. (There was, in fact, no such flood of transfers attempted.) The City knew that transfer of these licenses was a valuable property right; in fact, the market value of these assignments was the impetus for the introduction of the amendments in the City Council. Despite its knowledge of Check-

er's proposed transfers for over *one year* prior to the moratorium, the City took no action to dissuade the transfers or suggest that it would attempt to block them. After plaintiffs expended considerable time and money on the transfers,[14] with the express guidance and supervision of the Commissioner and other City officials, the Commissioner suddenly imposed a moratorium. The City cannot create a valuable property right, encourage its use, and then unilaterally suspend it, thus effectively destroying it, without any prior notice to the holders of that right.

The court finds that the City has not presented any "important governmental or general public interest" or "any extraordinary situation where some valid governmental interest" justifies the Commissioner's unilateral action in this case. *Fuentes v. Shevin*, 407 U.S. at 82, 92 S.Ct. at 1995. *See Littlefield v. City of Afton*, 785 F.2d 596, 603 (8th Cir.1986). The City's disapproval of Checker's attempt to exercise a valid right in the ordinary and customary way does not justify abrogating it without notice. Until the City Council acted, the ordinances of the City of Chicago required the Commissioner to approve these transfers. The owners of the licenses were authorized to transfer them and entitled to expect the same treatment from the Commissioner that had been accorded to every previous assignment during the life of the ordinance. Her sudden shift in the procedure violated plaintiffs' rights to procedural due process. The City's knowledge of these proposed transfers for over one year demonstrates that it could have practically provided a hearing prior to the imposition of this moratorium. *Compare Greco v. Guss*, 775 F.2d 161, 171 (7th Cir.1985). The Commissioner's abrogation of the assignment procedure, which provided neither a pre- nor a post-deprivation hearing clearly violated plaintiffs' rights to procedural due process.[15]

14. Checker's president, Jerry Feldman, filed an affidavit stating that, as of July 15, 1982, Checker had already expended over $140,000 in attorneys' fees and over 2000 man-hours in contemplation of the proposed assignments. Feldman Aff. ¶ 12.

15. Count I of the amended complaint also alleges that the moratorium violated plaintiffs' right

### Damage

Plaintiffs' motion for summary judgment requests declaratory and injunctive relief ordering the Commissioner to process the assignments which were prepared during the term of the illegal moratorium. In the June 17, 1983 order denying plaintiffs' motion for summary judgment, the court held that plaintiffs were not entitled to injunctive relief because they had an adequate remedy at law for money damages. *Flower Cab, supra,* slip op. at 12–13 [692 F.2d 760 (Table)]. Mr. Feldman's affidavit demonstrates that money damages are ascertainable, and that this case does not present an appropriate situation for an award of injunctive relief. The court finds that plaintiffs are entitled to damages resulting from all approvals which were improperly withheld for the duration of the moratorium.[16] Since the plaintiffs have presented little evidentiary material by way of damages, the court shall schedule a hearing to determine damages for the constitutional violations caused by this moratorium.[17] This hearing shall include evidence on the mitigation of damages.

### Conclusion

For the reasons set forth above, the court finds that there is no genuine issue of material fact with respect to defendants' liability under Count I of the amended complaint. Accordingly, the court grants plaintiffs' motion for summary judgment with respect to Count I.

to equal protection. Economic legislation offends the equal protection clause only if the City's treatment of plaintiffs bears no rational relationship to a legitimate government interest. *San Antonio Independent School District v. Rodriguez,* 411 U.S. 1, 40, 93 S.Ct. 1278, 1300, 36 L.Ed.2d 16 (1973). The plaintiffs have not pressed the equal protection issue in their present motion; and the court expresses no opinion on the viability of this claim.

16. The retroactive provision of the September 15, 1982 ordinance does not impair plaintiffs' right to damages for the Commissioner's wrongful refusal to approve the transfer. Putting aside from the constitutional problems implicit in this legislative attempt to authorize a clearly unconstitutional moratorium, the court notes that Illinois law clearly allows plaintiffs in this situation to enforce the ordinance as it existed prior to the invalid suspension of the ordinance. In *Phillips Petroleum Co. v. City of Park Ridge,* 16 Ill.App.2d 555, 565–66, 149 N.E.2d 344, 350 (1958), the court explained:

> [T]he plaintiff does not claim that it had acquired a vested right, but it does claim that because of the improper, invalid and arbitrary action of ... the city of Park Ridge, in reliance upon a void resolution, the plaintiff, although having acquired title to the property in question, was prevented from taking any measures which could have given it a vested right, and it contends that the defendants cannot in this court urge that the case should be disposed of here under the now existing zoning ordinance. With this contention of the plaintiff we are in accord. It would be a strange perversion of the law to hold that the defendants could now take advantage of their own wrong and in effect say that by virtue of the subsequent amendatory ordinance the plaintiff could now be prevented from building and operating a filling station since it had not taken any steps under which it could have acquired a vested right, when the reason that it had not was because it was prevented from acting by the invalid resolution passed by the city council. The rights of the parties crystallized at the time when the permit was applied for and was improperly withheld. To hold otherwise would be to give the city, without statutory authority, a right to suspend a zoning ordinance.

These comments are equally applicable to the present case. Checker expended considerable time and money preparing its assignments, with the express approval of the Commissioner and in reliance on the existing ordinance and its historical application. The city's attempt to retroactively bar Checker and Yellow from enforcing their rights under the ordinance does not deprive them of their right to damages for the Commissioner's patently unconstitutional moratorium.

17. Plaintiffs' motion for summary judgment only addresses the validity of the moratorium. In order to recover damages resulting from the moratorium, plaintiffs must establish that the applications for assignment would have been filed and approved during the moratorium. Checker can clearly recover damages for the thirteen attempted transfers to Flower and the 85 contracts which were completed by August 9, 1982 (*See* Feldman Aff. ¶ 11). Checker also claims to have received deposits for an additional 424 transfers. In order to recover damages *under Count I,* Checker must establish that these contracts would have been completed and the assignments filed during the term of the moratorium, July 16, 1982 to September 15, 1982.